### UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| In re: ) | |
| ) | Case No. 20-20111 |
| MOUNTAIN STATES ROSEN, LLC ) | |
| ) | Chapter 11 |
| ) | |
| ) | |
| Debtor in Possession. ) | |

### FIRST DAY AFFIDAVIT OF BRAD GRAHAM

I, Brad Graham, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury:

1.  I am the President of Mountain States Rosen, LLC (the "Debtor" or "MSR"), a Wyoming limited liability company and the debtor and debtor-in-possession in the above-captioned chapter 11 case, which has its offices at 920 7th Ave. Greeley, Colorado 80631.

2.  I am a forty-year veteran of the Meat and Grocery industry. I have served in many senior level positions, including at Safeway Stores and Harris Teeter. In addition, I have served on many industry boards. I have a Bachelor of Science degree in Business Administration and live in the Colorado Rockies with my wife Betty.

3.  On March 19, 2020 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Wyoming.

4.  The Debtor is authorized to operate its business and manage its properties as a debtor-in-possession under 11 U.S.C. §§ 1107(a) and 110. No creditors' committee has yet been appointed in this case by the Office of the United States Trustee, nor has any trustee or examiner been requested or appointed.

5.  I submit this affidavit (the "First Day Affidavit") to provide an overview of the Debtor and this Chapter 11 case and to support the Debtor's applications and motions for "first-day" relief. Except as otherwise indicated herein, all facts set forth in this First Day Affidavit are based upon my personal knowledge of the Debtor's business operations and finances, information learned from my review of relevant documents, information supplied

{Z0308745/1}                                             1

to me by Debtor's other management and employee's or the Debtor's professional advisors, or my opinion based on my experience, knowledge, and information concerning the Debtor's business operations and finances.

6. I am authorized to submit this First Day Affidavit on Debtor's behalf and, if called upon to testify, I could and would testify competently to the facts set forth herein.

7. To minimize the adverse effects of filing for bankruptcy protection on its business, Debtor has requested various types of "first-day" relief (collectively, the "First Day Motions"). The First Day Motions seek relief intended to allow Debtor to continue to operate its business with minimal interruption and perform and meet the obligations necessary to fulfill its duties as debtor-in-possession. I am familiar with the contents of each First Day Motion and the exhibits thereto, and believe the relief sought in each First Day Motion is (1) necessary to enable Debtor to operate in Chapter 11 with minimal disruption or loss of productivity or value; (2) is critical to achieving a successfully reorganization; and (3) is in the best interest of Debtor's estate and creditors.

8. The first part of this declaration describes the Debtor's business operations, capital structure, and the circumstances leading up to filing. The second party sets forth the relevant facts in support of the First Day Motions.

## I. Debtor's Business, Capital Structure, and Circumstances Leading to Filing

9. The Debtor is a meat packing company located in Greeley, Colorado. Debtor employs approximately 250 people with a variety of backgrounds and diverse talents. Debtor has a vital business relationship with the Mountain States Lamb & Wool Cooperative (the "Co-op"). The Co-op has over 150 members from third, fourth, and fifth generation ranching families throughout the country.

10. Debtor is a fully owned subsidiary of the Co-op, which is a fully owned subsidiary of Mountain States Lamb Cooperative.

11. Because of the quality lambs the Co-op delivers daily to Debtor, Debtor has the opportunity to market its point of difference to the Lamb enthusiasts of the world. Debtor leverages being the only vertically integrated lamb company in the United States. Using this business model, Debtor can control its raw materials and processes from the ranch gate to the customer's plate. Currently, Debtor holds a 20% market share in the lamb industry.

12. Debtor is a privately owned company with support from 150 Co-op members throughout the United States who supply the bulk of its lamb needs. The seven-member Board of Directors works closely with the Co-op to ensure supply of the raw materials and enhance the relationship with Debtor.

13. Debtor's main business is meatpacking. It is a totally integrated company that controls the process from farm to plate.

14. Debtor's location in Greeley, Colorado is strategically located to provide easy access to the live lambs that come from the Co-op producers. Further, its location ensures its ability to distribute products across the United States.

15. Debtor has a customer base of over 400 organizations across the United States, Mexico, Canada, China, Hong Kong, Singapore, Viet Nam, Bermuda, and the Bahamas. From the retail perspective, Safeway, Kroger, HEB, Bashas, Heinen's Inc, and WinCo Foods are Debtor's primary customers. Debtor's distributors include Sysco, Shamrock, US Foods, Allen Brothers, and K & M Food Service. Further, Debtor uses 100% of its lamb and sells fat, bone, livers, lungs, and blood to Premium Pet, Darling International, and JBS.

16. For about the last six months, Debtor has been in regular talks with CoBank, Debtor's primary lender to come to a resolution over its distressed lending relationship with CoBank.

17. Before filing this case, Debtor was working on several fronts to reduce its costs, increase its revenue, and expand profitability. In particular, Debtor recently sold a costly New York City facility and operation, which has reduced ongoing costs and provided cash to pay down CoBank's debt. Debtor has also identified its marketing efforts as a weakness and has begun evaluating proposals from marketing firms to employ social networking, print advertising, and other avenues to reach its customers. Debtor notes that where food comes from is a critical piece of premium food product marketing. Debtor's marketing efforts will tell the story of the Co-op's generations old family farms and their history of commitment to animal welfare. By working together, Debtor and the Co-op maintain control of the lamb from birth to plate. Debtor's efforts will market this history and tell the story of these farms. Debtor is poised to be highly successful in this market, as its vertically integrated structure allows its customers to know the story of where its lamb comes from.

18. Additionally, U.S. lamb consumption has remained stable at about 1.1 pounds per capita declining from 4.5 pounds in the early 1960's. Most Americans eat no lamb at all, while some communities consume much more than a pound. The 1.1 pounds of

consumption is highly driven by two eating events each year, Easter and Christmas. Debtor believes that education and marketing to create just one more eating event each year could grow the industry by 33% percent. Further, the average lamb consumer is generally older. Debtor believes a strong opportunity exists to market its lamb to a younger generation that is open to variety.

19. For example, Lamb is the fastest growing animal protein on restaurant menus. In 2014, lamb appeared on 13 percent more menus than in 2000. This trend is boosted by the adoption of spicy merguez sausage where lamb is a key ingredient. Among restaurant chains and independents, lamb grew 44 percent in the last nine years.

20. In short, MSR believes that there is a huge potential for a market that has never been developed. The upside includes a growing market segment, leveraging the extended shelf life to retailers, with the potential to reach consumers in a high-end consumer market with online sales where those consumers can become advocates for quality domestic lamb.

21. Debtor's failure would doom the American lamb industry. By telling the unique story of the generations of family farms that provide Debtor's lamb, Debtor can market its products to these consumers and thereby preserve that story.

22. Unfortunately, MSR has faced short-term financial hurdles that have made it necessary to seek relief in this Court. In particular, negotiations with the Bank, along with a possible spring/summer sale—especially with the substantial anticipated sales that occur annually over Easter—made it seem likely that MSR would recover. Nevertheless, the COVID-19 pandemic has hit Debtor very hard. The average consumer is reducing or eliminating their purchase of high-end food products, purchasing staples and shelf-stable goods instead. As a result, Debtor' grocery customers are reducing or eliminating their purchase of high-end food products like Debtor's lamb. Debtor's sales have dropped substantially in just a short time period.

23. This sales dip is temporary, however, because it is due to short-term buying trends in response to the COVID-19 outbreak. Accordingly, Debtor believes that it has a strong opportunity to reorganize or sell as a going concern. The short-term, however, presents a challenge. Debtor believe that Chapter 11 represents the best path for Debtor to survive the low-sales event presented by COVID-19, keep its workforce employed, and continue to provide high-quality lamb to its discerning customers.

## II. Evidentiary Support for First Day Motions

24. On or about the Petition Date, the Debtor filed its *Motion for Interim Order Authorizing Use of Cash Collateral and Setting Final Hearing* (the "Cash Collateral Motion").

25. The Debtor intends to continue its business operations during this chapter 11 case and propose a plan of reorganization providing for the continuation of the Debtor's business operations. To do so, the Debtor requests authority to use cash and income receipts which may be subject to liens held by the Debtor's prepetition creditors. Without the use of the cash collateral, the Debtor will have insufficient funding for business operations, and the Debtor will not be able to pay employees, rent, utilities, supplies and other costs its operation. I believe the Debtor's use of cash collateral is critical to preserve the value of its assets and property during the chapter 11 case and will avoid immediate and irreparable harm to the Debtor's estate and creditors.

26. The Debtor proposes to provide CoBank with adequate protection of their interests in the cash collateral with replacement liens holding the same relative validity and priority in the Debtor's assets as on a pre-petition basis, keeping within the borrowing based as set forth in the parties lending relationship. the Debtor will keep its assets and equipment insured and in good repair, and will provided CoBank with complete monthly accountings of all revenue, expenditures and collections. I believe the terms of the adequate protection described in the Cash Collateral Motion are sufficient and reasonable under the circumstances.

27. On or about the Petition Date, the Debtor filed its *Motion for Entry of Interim and Final Orders (A) Approving Adequate Assurance of Payment to Utility Providers, (B) Establishing Procedures for Resolving Objections by Utility Providers, (C) Prohibiting Utility Providers from Discontinuing, Altering or Refusing Service, and (D) Granting Related Relief* (the "Utilities Motion"). I have reviewed the Utilities Motion and the factual statements contained therein are true and correct.

28. In connection with its operations, the Debtor receives utility services from several utility providers (the "Utility Providers"), including, but not limited to, water, gas, electricity, telephone, and sewer service (the "Utility Services"). The Utility Providers include, without limitation, the entities set forth on the list attached to the Utilities Motion as Exhibit A.

29. The Utility Services provided to the Debtor are crucial to Debtor's continued operations. The Debtor requires electric, water, heat, waste management and internet

services to operate. Any disruption in the Utility Services would cause immediate and irreparable harm. Accordingly, the Debtor seeks to preserve the protections that Utility Providers have under the Bankruptcy Code, while affording the Debtor an opportunity to provide and negotiate any additional adequate protection without facing the threat of imminent termination of Utility Services. The Debtor also seeks in the Utilities Motion to prohibit Utility Providers from altering, refusing, or discontinuing Utility Services to the Debtor absent further order of the Court.

30. On or about the Petition Date, the Debtor filed its *Ex Parte Motion to Limit Notice* (the "Motion to Limit Notice"). In that motion, the Debtor seeks authorization to limit service of pleadings and other notices in the chapter 11 case.

31. The Debtor has approximately 200 creditors. I believe the burden and expenses associated with serving all pleadings and other notices on all creditors would be substantial and cause significant expense to the Debtor, and the funds necessary to pay for such service would be better used to fund Debtor's continued post-petition business operations, maximize the value of the Debtor's business, fund Debtor's reorganization efforts, and provide a greater potential return to creditors in this case. I further believe limiting notice to (1) the Debtor's prepetition secured creditors; (2) the Debtor's top twenty (20) unsecured creditors including priority creditors; (3) utility providers; (4) any committee appointed under § 1102; (5) any counsel to the committee appointed under § 1102; (6) the Office of the United States Trustee; (7) any party against whom relief is sought by the particular intended action; and, (8) those who have formally appeared and requested notice is in the best interest of the Debtor's estate, creditors, and other parties in interest, and will further the economic administration of this case.

Dated this ___ day of March, 2020.

*[signature: Brad Graham]*
Brad Graham, President
Mountain States Rosen LLC

{Z0308745/1}   6