Bradley T. Hunsicker (Wyoming Bar No. 7-4579)
James T. Markus (*pro hac vice*)
Markus Williams Young & Hunsicker LLC
2120 Carey Avenue, Suite 101
Cheyenne, WY 82001
Telephone: 307-778-8178
Facsimile: 307-638-1975
bhunsicker@MarkusWilliams.com

COUNSEL FOR DEBTOR
AND DEBTOR IN POSSESSION
MOUNTAIN STATES ROSEN, LLC

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF WYOMING**

| | |
|---|---|
| In re: ) | |
| ) | Case No. 20-20111 |
| MOUNTAIN STATES ROSEN, LLC ) | |
| ) | Chapter 11 |
| ) | |
| ) | |
| Debtor in Possession. ) | |

**MOTION OF THE DEBTOR FOR ENTRY OF AN ORDER (A) APPROVING BID PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS; AND (B) APPROVING BREAK-UP FEE**

Mountain States Rosen, LLC ("**Debtor**"), debtor-in-possession herein, by and through its undersigned proposed counsel, hereby files this motion (the "**Motion**") pursuant to 11 U.S.C. §§ 105(a) and 363 and Fed. R. Bank. P. 2002 and 6004 seeking the entry of an order: (a) approving bid procedures for the sale of substantially all of the Debtor's assets (the "**Assets**"); and (b) approving the Break-Up Fee, as defined herein, to the extent applicable. In support of this Motion, the Debtor states as follows:

{Z0315364/1}        1

## JURISDICTION

1. This Bankruptcy Court (the "**Court**") has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief sought herein are 11 U.S.C. §§ 105(a) and 363 and Fed. R. Bankr. P. 2002(a)(2) and 6004.

## BACKGROUND

2. On March 19, 2020 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor continues to manage its business as debtor-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108.

3. On April 3, 2020, the Office of the United States Trustee (the "**UST**") filed a *United States Trustee's Notice of Appointment of Unsecured Creditors Committee* (Docket No. 36), appointing an official committee of unsecured creditors (the "**Committee**") in this case to represent the interests of unsecured creditors. The UST subsequently filed a *United States Trustee's Amended Notice of Appointment of Unsecured Creditors Committee* (Docket No. 38) to add additional members to the Committee.

**A.    The Debtor's Business Operations, Corporate Structure and Events Leading Up to the Filing of The Case.**

4. The Debtor is a premium lamb processing, harvesting, and fabricating company located in Greeley, Colorado, and employs approximately 230 people with a variety of backgrounds and diverse talents. The Debtor obtains most of its livestock through purchases from Mountain States Lamb Cooperative (the "**Co-op**") based on market

prices. The Co-op has over 150 members from third, fourth, and fifth generation ranching families throughout the country. The Debtor is a fully owned subsidiary of Mountain States Lamb and Wool Cooperative, which is a fully owned subsidiary of the Co-op. The Debtor purchases the substantial majority of its lamb from the Co-op. The Debtor's main business is harvesting and meatpacking of lamb. It is a vertically integrated company, from procurement and production of lamb products and uses 100% of its lamb, and sells fat, bone, livers, lungs, and blood to Premium Pet, Darling International, and JBS USA Food Company.

5. The Debtor's lamb fabrication facility is located at 920 7th Ave. Greeley, Colorado 80634 (the "**Greeley Facility**"). Substantially all the Debtor's other assets are meat harvesting, fabricating, and packing equipment located at the Greeley Facility. The Greeley Facility is strategically located to provide easy access to the live lambs coming from the Co-op producers. Further, the Greeley Facility's location ensures the Debtor's ability to distribute products across the United States.

6. Prior to the Petition Date, the Debtor was working on several fronts to reduce its costs, increase its revenue, and expand profitability. More specifically, the Debtor sold a costly New York City facility and operation, which reduced ongoing costs and provided cash to pay down debt owed to CoBank, the Debtor's primary lender.

7. The Debtor also spent eighteen months marketing and exploring a sale of the Greeley Facility as a going concern continuing the business of the Debtor. The Debtor had executed a letter of intent with an industry leading veal and lamb company (the "**Potential Pre-Petition Buyer**"). The Debtor worked for many months to consummate the sale to

the Potential Pre-Petition Buyer both inside and outside of a chapter 11 process. However, despite the Debtor's best efforts, it was not able to close the sale to the Potential Pre-Petition Buyer. Soon thereafter, the Debtor's secured lender, CoBank, refused to extend the loan, issued a default notice and was about to commence a state-court receivership action, which Debtor believes would have shuttered the Greeley Facility and caused a forced liquidation of the Debtor's assets, the loss of 230 jobs and created even greater havoc on the domestic lamb industry, beyond the severe impact of the COVID-19 pandemic.

8. The Debtor commenced this case to preserve the going concern value of its assets for the benefit of CoBank, creditors, the employees, and the other parties in interest.

9. Fortunately, Debtor has secured another buyer, Greeley FAB, LLC ("**Greeley FAB**") to purchase Debtor as a going concern despite the COVID-19 pandemic and its severe negative impact on the United States economy and the lamb market.

**B.     The Greeley FAB, LLC Stalking Horse Offer.**

10. In late April 2020, the Debtor received an offer from Greeley FAB for the sale and purchase of substantially all of the Debtor's Assets and for ten million dollars ($10,000,000) as well as assumption of certain liabilities, including but not limited to a PPP Loan (as defined below) in the amount of $3,595,000 (the "**Greeley FAB Offer**"). Greeley FAB is an insider of the Debtor under the meaning of 11 U.S.C. § 101(31).

11. The Debtor notified both CoBank and the Committee about the terms of the Greeley FAB offer and for the last two weeks has worked to move forward with a sale process. However, as detailed below, CoBank has been unwilling to agree to start a sale

{Z0315364/1 }                                                4

process due to its demands to bring in an additional investment advisor and CoBank's inability to agree on the structure and compensation for this additional professional.

12. The Debtor, upon consultation with its counsel and independent financial advisor, r² advisors LLC ("**r²**"), believes the Greeley FAB Offer is fair, reasonable and in the best interest of the estate. In fact, the Debtor believes the Greeley FAB offer is superior to the proposed prepetition sale to the Potential Pre-Petition Buyer. The Debtor decided to accept the Greeley FAB Offer, which is subject to Court approval and to receiving higher and better offers through a competitive bidding process to market test the Greeley FAB Offer.

13. Although the Debtor believes the Greeley FAB Offer is fair and reasonable and reflects the highest and best value for the Assets as of the date of this Motion, the Debtor proposes to market test and shop the Greeley FAB Offer for potential overbids and in such a case hold an auction (the "**Auction**") in hopes that higher and better offers are generated for the Assets in order to maximize value for the estate.

14. Greeley FAB has agreed to allow the Greeley FAB Offer to be subject to the Auction in return for receiving certain buyer protections as discussed in more detail below. Accordingly, the Debtor proposes to sell its Assets to Greeley FAB pursuant to the Greeley FAB Offer (the "**Greeley FAB APA**"), subject to higher and better offers through the Auction process. The following is a summary of the terms and conditions of the Greeley FAB APA. In the event of a conflict between the below summary and the Greeley FAB APA, the Greeley FAB APA shall control (capitalized terms are defined in the Greeley FAB APA unless indicated otherwise):

{Z0315364/1}  5

a. **Purchase Price**: The aggregate purchase price for the sale and purchase of the Included Assets is ten million dollars ($10,000,000), adjusted if necessary, as of the Closing as provided in the Greeley FAB APA, plus assumption of the Assumed Liabilities, including without limitation assumption of the PPP Loan (as defined below).

b. **Purchased Assets**: All of the direct and indirect right, title and interest of the Debtor in and to all tangible and intangible assets, properties, rights, claims and Contracts used, useful or held for use in, or related to, the Business, including: all Current Assets, including, but not limited to, accounts receivable, prepaid insurance, prepaid expenses and other current assets related to the Greeley Facility, but excluding all cash other than the proceeds of the Paycheck Protection Program Loan from the Converse County Bank of Douglas, Wyoming to Mountain States/Rosen, LLC, designated Loan No. 7393037, dated April 15, 2020 in the principal amount of $3,595,000.00 (the "**PPP Loan**") including all undistributed and unspent proceeds from the PPP Loan; all Inventory and supplies relating to or located at the Greeley Facility; all Equipment, including, but not limited to, furniture, fixtures, machinery, vehicles, rolling stock, computers and computer equipment, parts, tools, supplies, signage, manuals, training materials and other items of Equipment relating to or located at the Greeley Facility and owned by the Debtor used for the operation of the Greeley Facility; fee simple title to the parcels of Land consisting of the Greeley Facility, together with all rights of way, easements, hereditaments, tenements and other rights appurtenant thereto, including any right, title and interests in and to any streets or other public ways adjacent to the Land and any water or mineral rights owned by, or leased to, the Debtor in relation to the Greeley Facility and any rights pursued or being pursued by the Debtor in relation to the Greeley Facility; all Improvements located on the Land, including but not limited to, the Greeley Facility, and all other structures, systems, fencing, security, and fixtures and all utilities and rights to utilities, including natural gas, electricity, water, municipal wastewater and all connections, taps, permits, licenses and all use rights relating to the utilities held by the Debtor or associated with, and utilized in, the ownership and operation of the Greeley Facility; all of Debtor's rights under those contracts of the Debtor that relate to the Greeley Facility and are required to operate and maintain the Greeley Facility consistent with past practices, as determined by Greeley FAB in its sole discretion, including, among others, (i) that certain Shared Services Agreement (Wastewater), that certain Shared Services Agreement (Steam) and that certain Shared Services

Agreement (Blood), each dated as of January 4, 2016 and each by and between Swift Beef Company and the Debtor (collectively, the "Swift Contracts"); all Intellectual Property, including, but not limited to, all domain names, computer programs, software, manuals and related rights; all registrations of trademarks and of other marks, registrations of trade names, labels or other trade rights, and applications for any such registrations; all names or tradenames by which the Greeley Facility or any part thereof may be known including, but not limited to, the trade names related to "Mountain States/Rosen", all copyrights, copyright registrations and applications therefor; all trademarks and other marks, trade names, trade dress, labels and other trade rights, whether or not registered; all inventions, designs, know-how, trade secrets, improvements, formulae and similar assets; all knowledge, know-how, inventions and improvements relating to any equipment, operations of the Greeley Facility, and all license, royalty or other agreements relating to any of the foregoing; all claims and causes of action relating to any of the foregoing, including claims and causes of action for past infringement; and all other intellectual property rights of any character or description including all good will associated with such intellectual property rights, to the extent relating to the Greeley Facility; all Books and Records, including, but not limited to, all lists, records, data bases, or other business information of any kind required by law to be kept and maintained, mailing lists, marketing and sales materials and records, financial and accounting information and records, business forecasts, sales and marketing plans and information manuals, training materials, and similar items, and all books, records, files, computer software, data or databases, telephone numbers, email addresses and fax numbers, correspondence, memoranda, notes and other documents or papers and other evidence thereof that the Debtor maintains or is required to maintain by law or by any third party, to the extent relating to the ownership of the Greeley Facility, if any; and all Permits owned or held by the Debtor relating to the use or ownership of the Greeley Facility, and any and all rights relating thereto and all documentation relating to any Permits.

c. **Excluded Assets**: Greeley FAB shall not purchase, and the Debtor shall retain: all cash funds in deposit accounts (other than any remaining proceeds of the PPP Loan) any other personal property owned by the Debtor not specifically listed or described as a purchased asset, any personal property or real property described in the Excluded Assets Schedule of the Disclosure Schedule; all rights or obligations under all contracts of the Debtor other than the Assumed Contracts, including, by way of illustration and without

limitation: (i) any employment agreements, Employee Plans (as hereinafter defined) or other employment related contracts or arrangements, (ii) any contract representing any indebtedness, and (iii) any lease for any property or facility; all the claims and causes of action of the Debtor or its estate under 11 U.S.C. §§ 502(d), 544, 545, 547, 548, 550 and 553, any other avoidance actions under the Bankruptcy Code and any commercial tort claims or any proceeds thereof.

    d.    **Assumed Contracts**:  All of Debtor's rights under those contracts of the Debtor relating to the Greeley Facility and required to operate and maintain the Greeley Facility consistent with past practices, as determined by Greeley FAB in its sole discretion, which contracts are set forth on the Assumed Contracts Schedule of the Disclosure Schedule attached to the Greeley FAB APA, which Assumed Contracts include, among others, (i) that certain Shared Services Agreement (Wastewater), that (ii) certain Shared Services Agreement (Steam) and (iii) that certain Shared Services Agreement (Blood), each dated as of January 4, 2016 and each by and between Swift Beef Company and the Debtor (collectively the "**Initial Assumed Contracts**"); *provided* that until the entry of the Final Sale Order, Greeley FAB reserves the right to amend the Assumed Contracts Schedule of the Disclosure Schedule in its sole and absolute discretion to add or delete contracts.

    e.    **Assumed Liabilities**:  Greeley FAB agrees to assume the following liabilities: the PPP Loan including all undistributed and unspent proceeds from the loan, as well as all attributes of the Debtor relating to Small Business Association guarantees, payments, and repayments relating to the Loan (to the extent such attributes are assignable); the obligation and liabilities to process lambs offered to Debtor or Greeley FAB to be processed at the Greeley Facility by Mountain States Lamb Cooperative (or its members) at market prices through July 31, 2020, providing that the Greeley Facility shall be operated at the same or greater capacities as of the date of the Greeley FAB APA and the Mountain States Lamb Cooperative (or its members) must not offer more than the Greeley Facility capacity on a daily basis; those liabilities and obligations arising out of or based upon Greeley FAB's ownership and operation of the Included Assets from and after the Closing Date; and the liabilities and obligations of the Debtor under the Assumed Contracts, but only to the extent such liabilities or obligations arise after or are attributable to periods ending after the Closing Date.

{Z0315364/1 }    8

f. **Excluded Liabilities**: All other obligations, debts, taxes, operating expenses, rent, utilities and other liabilities of the Debtor of any kind, character or description, whether accrued, absolute, contingent or otherwise, shall not be assumed by Greeley FAB and shall be retained by the Debtor. Without limiting the foregoing, Greeley FAB shall not assume, and the Debtor shall retain: all loans, accounts and other amounts payable or to become payable by the Debtor, whether to financial institutions, officers, stockholders, affiliates or otherwise to any other person, including any accounts payable to any and all vendors with respect to any period of time prior to or attributable to periods ending on or before the Closing Date; all liabilities and obligations of the Debtor in respect of any Taxes; any liabilities or obligations under the Assumed Contracts with respect to any period of time prior to or attributable to periods ending on or before the Closing Date; all liabilities and obligations under any contracts that are not Assumed Contracts. In particular, but without limitation, Greeley FAB shall not assume any liabilities of the Debtor under, and Greeley FAB shall not be deemed a successor company to the Debtor in connection with, any Employee Plan, collective bargaining agreement or other employment related arrangement to which the present or former employees of the Debtor are or were entitled (including any severance arrangements or pension plans or obligations whether the Debtor incurred such obligations as a result of the Debtor employing Employees at current or formerly owned facilities, or the Debtor assumed or was assigned such obligations), and Greeley FAB shall have no obligation to employ any of the Debtor's employees in connection with or after the transactions contemplated by the Greeley FAB APA; all liabilities and obligations relating in any manner to any of the Excluded Assets. The Debtor shall be responsible for paying all costs of cure necessary for the assumption and assignment of the Assumed Contracts to Greeley FAB as of the Closing Date.

g. **Deposit**: $250,000.00 shall be submitted to an escrow agent and the escrow agent shall hold the deposit as security for the performance of the parties' obligations under the Greeley FAB APA.

h. **Representations and Warranties; Covenants**: The representations and warranties and covenants are customary for a transaction of this type, including, without limitation, representations and warranties regarding the authority to enter into the Sale transaction, contract cure obligations, the best efforts of the parties, notices and consents, access to information and the risk of loss.

    i.    **Bidding Procedures**: The Greeley FAB APA contemplates Court approval of bidding procedures to govern the Auction sale. The proposed bidding procedures are discussed more fully below.

    j.    **Break-Up Fee**: In the event that the Greeley FAB APA is terminated at any time before a Closing occurs with Greeley FAB because the Debtor has entered into an agreement with respect to a Sale of the Assets with an alternate entity, the Debtor shall pay Greeley FAB a breakup fee in the amount of no less than $75,000 and up to an additional $75,000 for out-of-pocket expenses relating to (collectively, the "Break-Up Fee") which shall be paid from the proceeds from the Sale of the Assets upon the Closing of the Sale to the alternate entity.

    k.    **Closing Date**: Upon the terms and subject to the conditions set forth in the Greeley FAB APA, the Closing of the sale and purchase of the Included Assets shall take place at such place and time and/or on such date as the Debtor and Greeley FAB may mutually agree but in no event later than June 30, 2020.

    l.    **Termination Provisions**: The Greeley FAB APA may be terminated: (i) at any time before the Closing: if Closing has not occurred by 11:59 p.m. EST on the Outside Date; by the mutual written consent of Greely FAB and the Debtor; (ii) by Greeley FAB by written notice to the Debtor if: there has been a material breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by the Debtor under the Greeley FAB APA that would give rise to the material failure of any of the conditions specified therein and such material breach, inaccuracy or failure has not been cured by the Debtor within 3 days of the Debtor's receipt of written notice of such breach from Greeley FAB; or any of the conditions set forth in Section 7.2 of the Greeley FAB APA shall not have been, or if it becomes apparent that any of such conditions will not be, fulfilled by the Outside Date, unless such failure shall be due to the failure of Greeley FAB to perform or comply with any of the covenants, agreements or conditions to be performed or complied with by it before the Closing Date.

**C.**    **Professionals Assisting in the Marketing/Sale Process.**

15.    On March 24, 2020, the Debtor filed its *Application to Employ R$^2$ Advisors LLC as Debtor's Financial Advisor Under 11 U.S.C. § 327(a) and Approve Retainer Nunc*

*Pro Tunc to the Date of the Filing of this Application*. (Docket No. 22). On March 26, 2020, this Court entered an order approving the r²'s employment in this case. (Docket No. 25). The Debtor anticipates use of r² to assist in the administration and execution of the anticipated sale process as detailed below.

16. Since it was retained, r² has undergone efforts to prepare the Debtor to proceed with anticipated sale process. As part of the anticipated sale process, r² set up an online data room controlled and maintained by r² (the "**Data Room**"). The Data Room consists of audited and unaudited financial statements, forecasts, budgets, property descriptions, deeds, employment structure and information, asset schedules, operational history, plant and production information, a comprehensive presentation on the Debtor's operations and other confidential information relevant to the Debtor's operations.

17. r² has also worked with Debtor's management to compile a comprehensive list of potential strategic purchasers and/or investors in the lamb, meatpacking and protein production business.

18. The Committee has moved to retain Alliance Management, LLC ("**Alliance**") to assist the Committee as its financial advisor in this case. See *Application For Order Authorizing and Approving Employment of Alliance Management As Financial Advisors to The Official Committee of Unsecured Creditors of Mountain States Rosen LLC Nunc Pro Tunc to April 27, 2020*. (Docket No. 96).

19. During the past two weeks, Debtor discussed the Greeley FAB Offer and a sale process with CoBank and the Committee. CoBank and the Committee expressed a view that the Debtor retain an additional professional, besides r², to market test the Greeley

FAB Offer, specifically recommending the Debtor engage a specific investment banker. Though the Debtor believes $r^2$ is well-qualified and able to lead an effective sale process, the Debtor interviewed CoBank's recommended investment banker on May 4 and 5, 2020, and indicated a willingness to retain them if doing so would secure a consensual sale process with CoBank and the Committee, provided that CoBank would fund the additional fees, costs and expenses of the professional.

20. The Debtor later learned that CoBank decided the Committee, and not the Debtor, should retain additional professional. Further, the Debtor is informed that CoBank, the Committee have not yet been able to work out agreeable terms for such an engagement at such additional cost.

21. CoBank has requested the Debtor defer filing anything regarding the sale. The Debtor has waited more than two weeks while CoBank evaluates various options. The Debtor believes any further delay would not be beneficial to either the sale process or maximizing the estate including the maximizing the interests of unsecured and creditors other than CoBank and, accordingly, has filed this Motion. Further, the Debtor sought CoBank's agreement to use cash collateral through July 31, 2020, but CoBank would only agree to such use through June 30, 2020 – the date Greeley FAB proposes as the outside date to close the proposed sale. Thus, in exercising its reasonable business judgment, the Debtor believes it is necessary proceed with this Motion at this time and invites CoBank and the Committee to work with and collaborate with the Debtor to allow the sale process to move forward in a timely and expeditious manner.

## RELIEF REQUESTED

**A.  Approval of the Bidding Procedures.**

22. To implement and conduct the Auction, the Debtor must submit bidding and auction procedures to the Court for approval.

23. To maximize the value of its Assets for the benefit of the Debtor's estate and its creditors, the Debtor proposes to implement a competitive bidding process designed to generate maximum recovery. Accordingly, the Debtor seeks the Court's approval of the bid procedures (the "**Bidding Procedures**") attached hereto as **Exhibit A** to govern the process for the sale of substantially all of the Debtor's Assets (the "**Auction Sale**"). The Bid Procedures, if approved, would be part of the case file and would be shared with all prospective purchasers.

24. The following is a summary of the Bidding Procedures, and in the event of a conflict between the below summary and the Bidding Procedures, the Bidding Procedures shall control:

   a. The Debtor is offering the Assets as a package and intends to accept whatever bid (each a "**Bid**") constitutes the highest or best offer to purchase the Assets as determined by the Debtor in Its Authorized Discretion (as defined below).

   b. The Assets will be subject to the Greeley FAB Offer of $10,000,000 plus the assumption of the Debtor's PPP Loan of $3,595,000. As a result, a Bid will only be considered a Qualified Bid (as defined in the Auction Procedures) if it is on terms substantially similar to terms of the Greeley FAB Offer and equal to, or exceeds, $10,250,000. The Greeley FAB Offer shall be deemed a Qualified Bid. If the Debtor does not receive a Qualified Bid other than the Greeley FAB Offer prior to the Bid Deadline (defined below), then the Greeley FAB Offer

shall constitute the highest or otherwise best Qualified Bid (i.e., the Winning Bid as defined below).

c. No later than two (2) business days after the entry of the Bidding Procedures Order, the Debtor will serve a list (or lists) of Assumed Contracts, if any, in addition to the Initial Assumed Contracts, on all counterparties to such contracts and leases, notifying such counterparties of the potential assumption by the Debtor and assignment to Greeley FAB or the successful bidder of the Assets at the Sale Hearing (the "**Cure Notices**"). The Cure Notices shall set forth the "cure" amounts owing on each of the Assumed Contracts, according to Debtor's books and records and, in accordance with the provisions set forth in the Bidding Procedures, shall be the amounts required to be paid pursuant to 11 U.S.C. § 365(b)(1) (the "**Cure Amounts**"). Objections, if any, to either the Cure Amounts or the assumption or assignment of these additional Assumed Contracts to Greeley FAB or the successful bidder or adequate assurance of future performance must be filed on or before the objection deadline to the proposed Sale. Objections to the adequate assurance of future performance of a successful bidder (other than Greeley FAB) may be raised at the Sale Hearing.

d. The bid deadline ("**Bid Deadline**") shall be on **June [22], 2020 at 12:00 p.m. Mountain Time** (or such other date as set by the Court). Prospective bidders may elect to submit Bids for the Assets by submitting written offers by executing and electronically delivering to $r^2$ a completed Asset Purchase Agreement (the "**Agreement**") that is in a form that will be available in the Data Room.

e. Following completion of the bidding process, if the Debtor receives a Qualified Bid (as defined in the Bid Procedures) other than the Greeley FAB Offer, the Debtor shall conduct a sale by an auction (the "**Auction Sale**") to be held on **June [24], 2020 at 9:00 am Mountain Time** (or such other date as set by the Court) at the law offices of Markus Williams Young & Hunsicker LLC, 2120 Carey Avenue, Suite 101, Cheyenne, WY 82001. Only parties that have submitted Qualified Bids as defined in the Bid Procedures, and their representatives, will be allowed to attend the Auction. If no Qualified Bids are received, the Debtor will immediately move for the approval of the Greeley FAB Offer.

f. During the period between the Bid Deadline and the Auction, the Debtor may hold discussions with one or more competing bidders to clarify their Bid(s). Prior to the commencement of the Auction, the

{Z0315364/1}  14

Debtor in Its Authorized Discretion shall designate the Qualified Bid it believes to be the highest and best offer for the Assets (the "**Initial Best Bid**").

g. To participate in the Auction, a prospective bidder must submit a Qualified Bid and a deposit equal to $250,000.00.

h. Before the commencement of bidding at the Auction, the Debtor will announce its designation of the Initial Best Bid. The Auction shall proceed in the order and manner deemed advisable by the Debtor in Its Authorized Discretion, to promote the most competitive bidding process possible. After the Initial Best Bid is disclosed, subsequent Bids shall be at least $100,000 greater than the previous bid (an "**Overbid Increment**"). An Overbid Increment may include "Non-Cash Consideration" as that term is defined in the Bid Procedures.

i. The amount of the Break-Up Fee may be added to and deemed a part of any Bid submitted by Greeley FAB.

j. The Auction Sale shall continue until there is only one offer that the Debtor in Its Authorized Discretion determines is the highest and best offer for the Assets. In making such a determination, the Debtor may consider: (1) the amount of the purchase price; (2) the form of consideration being offered; (3) the likelihood of the Qualified Bidder's ability to close a transaction; and, (4) the net benefit to the Debtor's estate and its creditors.

k. Upon completion of the Auction Sale, the Debtor shall announce to the Qualified Bidders which bid represents the highest and best offer for the Assets (the "**Winning Bid**").

l. The Debtor reserves the right to designate with respect to the Winning Bid a competing bid (a "**Backup Bid**") that shall be substituted for such Winning Bid in the event that the Winning Bidder is unable to consummate the sale with respect to such Winning Bid.

m. Immediately after its Bid is selected as the Winning Bid, the winning bidder must immediately execute and deliver to the Debtor an addendum to its Agreement that binds the winning bidder to perform its Winning Bid.

n. Debtor shall present the Winning Bid for approval at a hearing to consider the entry of a sale order (the "**Sale Order**") which hearing

shall be set for **June __, 2020** [Debtor proposes a hearing after June 24 and on or before June 30 if available].

o. The Debtor in Its Authorized Discretion reserves the right to modify, augment, or amend the Bid Procedures at any time subject to the approval of the Court, and, without limitation, the Debtor reserves the right to extend, modify or terminate the sale process up until the time of entry of the Sale Order.

p. Any actions or decisions to be made by the "**Debtor in Its Authorized Discretion**" shall be made by r$^2$ as the Court-approved disinterested financial advisor for the Debtor after consultation with the Debtor, the Committee and CoBank.

25. Courts have indicated that a trustee's business judgment is entitled to substantial deference with respect to the procedures selected to sell assets of the estate. *See, e.g., Official Committee of Subordinated Bondholders v. Integrated Resources, Inc.* (*In re Integrated Resources, Inc.*), 147 B.R. 650, 656-57 (S.D.N.Y. 1992) (noting that overbid procedures and break-up fee arrangements negotiated by a debtor are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid"); *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D. N.Y. 1989); *In re Lahijani*, 325 B.R. 282, 288-89 (9th Cir. BAP 2005).

26. A trustee must articulate a valid business justification to obtain court approval to proceed with asset sales outside of the ordinary course of business under 11 U.S.C. § 363. *See, e.g., Myers v. Martin* (*In re Martin*), 91 F.3d 389, 395 (3rd Cir. 1996) (citing *Fulton State Bank v. Schipper* (*In re Schipper*), 933 F.2d 513, 515 (7th Cir. 1991)). Here, the proposed Bid Procedures are reasonable, appropriate, and within the Debtor's sound business judgment under the circumstances because they will serve to maximize the

value of the estate and are anticipated to enable the Debtor to maximize any distribution to its creditors.

27. The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received. *See, e.g., Four B. Corp. v. Food Barn Stores, Inc.* (*In re Food Barn Stores, Inc.*), 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate"). Courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales. *See, e.g., Integrated Resources*, 147 B.R. at 659. The Debtor believes the Bid Procedures establish the parameters under which the value of the Debtor's Assets may be tested at the Auction Sale. Such procedures unquestionably will increase the likelihood the Debtor will receive the greatest possible consideration for the Assets because they will ensure a competitive and fair bidding process.

28. One important component of the Bid Procedures is the overbid requirements. The initial overbid requirement is necessary to not only compensate the Debtor for the risk it assumes in foregoing a known, willing and able purchaser (*i.e.*, Greeley FAB), but also ensures there is an increase in net proceeds to account for the Break-Up Fee. *See, e.g., In re Wintex, Inc.*, 158 B.R. 540, 543 (D. Mass. 1992) (finding "a debtor may avoid the increased cost and complexity associated with considering additional bids unless the additional bids are high enough to justify their pursuit").

## B.     Approval of the Break-Up Fee.

29.     The law is well-settled that a debtor's business judgment is entitled to substantial deference with respect to break-up fee arrangements. *In re Integrated Resources, Inc.*, 147 B.R. at 657. Without the buyer protections sought herein, Greeley FAB would likely not be proceeding with this proposed acquisition subject to the Bid Procedures at this time. Accordingly, the Debtor has agreed to provide, and to seek at this time, the Court's approval of certain bid protections for Greeley FAB. In summary, if Greeley FAB does not submit the Winning Bid but otherwise participates at the Auction, and the Debtor's Assets are purchased by another party, Greeley FAB shall be paid no less than $75,000 and up to an additional $75,000 for out-of-pocket expenses, which will serve as consideration for the break-up fee (the "**Break-Up Fee**"). Greeley FAB will not be entitled to the Break-Up Fee in the event it withdraws or terminates the Greeley FAB Offer prior to the commencement of the Auction.

30.     Because Greeley FAB has expended time, energy and resources necessary to submit a stalking horse bid, the Debtor has agreed to provide, and seek the Court's approval of, the Break-Up Fee.

31.     The Debtor believes the Break-Up Fee, which is less than 1.2% of the total consideration offered by Greeley FAB is fair and reasonable in view of the analysis and negotiations undertaken by Greeley FAB. If the Break-Up Fee is triggered, Greeley FAB's efforts will have directly influenced the chances the Debtor will receive the highest or otherwise best offer for the Assets. Accordingly, the Break-Up Fee is within the Debtor's sound business judgment.

32. The Debtor asserts the Break-Up Fee is normal, and often, a necessary component of a sale outside the ordinary course of business under 11 U.S.C. § 363. *See*, *e.g.*, *In re Integrated Resources, Inc.,* 147 B.R. at 659 (finding such procedures "encourage bidding and maximize the value of the debtor's assets"). Moreover, the amount of the Break-Up Fee is reasonable and appropriate considering the size and nature of the Sale of the Assets and the efforts that have been and will be expended by Greeley FAB. *See*, *e.g.*, *In re Financial News Network*, 980 F.2d 165, 167 (2nd Cir. 1992) (approving over 5% break-up fee); *In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 536 (3rd Cir. 1999) (noting combined break-up fee and expense reimbursement of approximately 4-5% was "within the range of fees approved by some courts").

33. In sum, the Debtor's ability to offer the Break-Up Fee to Greeley FAB enables the Debtor to ensure the sale of substantially all of the Assets to Greeley FAB is at a price they believe to be fair while, at the same time, provides the Debtor with the potential of even greater benefits to the estates. If another bidder other than Greeley FAB is chosen, the Break-Up fee will be funded with the initial overbid requirement and result in an enhanced sale value for the Assets.

## NOTICE

34. This Motion and an opportunity to object is being provided to all parties on the Limited Service List approved by the Court. In addition, notice of this motion and an opportunity to object is being provided to all parties on the Debtor's creditor matrix. The Debtor submits this notice is reasonable and appropriate under the circumstances.

**WHEREFORE**, the Debtor respectfully request that the Bankruptcy Court enter an order: (A) approving the Bid Procedures attached hereto as <u>Exhibit A</u>; and, (B) approving the Break-Up Fee as contemplated and defined herein, and for such further and additional relief as the Bankruptcy Court deems proper.

Dated: May 20, 2020

                      MARKUS WILLIAMS YOUNG AND HUNSICKER LLC

                      By: /s/ *Bradley T. Hunsicker*
                      Bradley T. Hunsicker (WY Bar No 7-4579)
                      2120 Carey Avenue, Suite 101
                      Cheyenne, WY 82001
                      Telephone: 307-778-8178
                      Facsimile: 307-638-1975
                      Email: bhunsicker@markuswilliams.com

                      *Counsel for the Debtor and Debtor-in-Possession Mountain States Rosen, LLC*