Bradley T. Hunsicker (Wyoming Bar No. 7-4579)
James T. Markus (*pro hac vice*)
Markus Williams Young & Hunsicker LLC
2120 Carey Avenue, Suite 101
Cheyenne, WY 82001
Telephone: 307-778-8178
Facsimile: 307-638-1975
bhunsicker@MarkusWilliams.com

COUNSEL FOR DEBTOR
AND DEBTOR IN POSSESSION
MOUNTAIN STATES ROSEN, LLC

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 20-20111 |
| MOUNTAIN STATES ROSEN, LLC | ) | |
| | ) | Chapter 11 |
| | ) | |
| | ) | |
| Debtor in Possession. | ) | |

**MOTION OF DEBTOR MOUNTAIN STATES ROSEN, LLC FOR AN ORDER: (A) APPROVING ASSET PURCHASE AGREEMENT AND AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS; (B) AUTHORIZING THE SALE OF ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, RIGHTS, ENCUMBRANCES AND OTHER INTERESTS PURSUANT TO BANKRUPTCY CODE SECTIONS 363(b), 363(f) AND 363(m); (C) ASSUMING AND ASSIGNING CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES PURSUANT TO BANKRUPTCY CODE SECTION 365; AND (D) GRANTING RELATED RELIEF**

Mountain States Rosen, LLC ("**Debtor**"), debtor-in-possession herein, by and through its undersigned proposed counsel, hereby files this motion (the "**Sale Motion**") for entry of an order: (a) approving the *Lamb Processing Facility Purchase Agreement* dated May 15, 2020 (the "**Greeley FAB APA**"), a copy of which is attached hereto as

**Exhibit A**),[1] between the Debtor, as seller, and Greeley FAB, LLC ("**Greeley FAB**"), as buyer, and authorizing the sale (the "**Sale**") of substantially all of the assets of the Debtor; (b) authorizing the sale of the assets free and clear of all liens, claims, rights, encumbrances, and other interests pursuant to 11 U.S.C. § 363(b), 363(f), and 363(m); (c) assuming and assigning certain executory contracts and unexpired leases pursuant to 11 U.S.C. § 365; and, (d) granting related relief.[2]

Concurrently herewith, the Debtor is filing the *Motion of the Debtor for Entry of an Order (A) Approving Bid Procedures for the Sale of Substantially All of the Debtor's Assets; and (B) Approving Break-Up Fee* (the "**Bidding Procedures Motion**"), which seeks approval of certain sale and bidding procedures (the "**Bidding Procedures**") for the Sale, as more particularly set forth therein.

In support of this Sale Motion, the Debtor respectfully states as follows:

### Preliminary Statement

1.    By this Sale Motion, the Debtor seeks approval of the Sale of substantially all of the assets of the Debtor (the "**Assets**") to Greeley FAB, pursuant to the Greeley FAB APA, or to the highest and best bidder for such Assets at the auction provided for in the Bidding Procedures Motion and the Bidding Procedures (the "**Auction**"), to take place in accordance with the order to be entered by the Court on the Bidding Procedures Motion (the "**Bidding Procedures Order**").  The proposed Greeley FAB APA contemplates the

---

[1] All capitalized terms not defined herein have the meanings ascribed to them in the Agreement.

[2] Unless otherwise specified, all references herein to "Section," "§," "Bankruptcy Code" and "Code" refer to the U.S. Bankruptcy Code, 11 U.S.C. § 101, *et seq.*

Debtor's Assets will be sold free and clear of liens, claims, encumbrances, rights, and other interests other than those liens and interests expressly permitted under the Greeley FAB APA. As discussed below, the Debtor believes the proposed Sale and Auction process is in the best interests of the Debtor and its estate and creditors.

### Jurisdiction and Venue

3.      The United States Bankruptcy Court for the District of Wyoming (the **"Court"**) has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory predicates for the relief sought herein are §§ 363, 365, 1107, and 1108, Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the **"Bankruptcy Rules"**), and Rule 2002-1 the Local Bankruptcy Rules of the District of Wyoming (the **"Local Rules"**).

### General Background

5.      On March 19, 2020 (the **"Petition Date"**), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor continues to manage its business as debtor-in-possession pursuant to §§ 1107 and 1108.

6.      On April 3, 2020, the Office of the United States Trustee (the **"UST"**) filed a *United States Trustee's Notice of Appointment of Unsecured Creditors Committee* (Docket No. 36), appointing an official committee of unsecured creditors (the **"Committee"**) in this case to represent the interests of unsecured creditors. The UST subsequently filed a *United States Trustee's Amended Notice of Appointment of Unsecured*

*Creditors Committee* (Docket No. 38) to add additional members to the Committee.

## Prepetition Sale Efforts

7.     The Debtor is a premium lamb processing, harvesting, and fabricating company located in Greeley, Colorado, and employs approximately 230 people with a variety of backgrounds and diverse talents.  The Debtor obtains most of its livestock through purchases from Mountain States Lamb Cooperative (the "**Co-op**") based on market prices.  The Co-op has over 150 members from third, fourth, and fifth generation ranching families throughout the country. The Debtor is a fully owned subsidiary of Mountain States Lamb and Wool Cooperative, which is a fully owned subsidiary of the Co-op.  The Debtor purchases the substantial majority of its lamb from the Co-op.  The Debtor's main business is harvesting and meatpacking of lamb. It is a vertically integrated company, from procurement and production of lamb products and uses 100% of its lamb, and sells fat, bone, livers, lungs, and blood to Premium Pet, Darling International, and JBS USA Food Company.

8.     The Debtor's lamb fabrication facility is located at 920 7th Ave. Greeley, Colorado 80634 (the "**Greeley Facility**").  Substantially all the Debtor's other assets are meat harvesting, fabricating, and packing equipment located at the Greeley Facility. The Greeley Facility is strategically located to provide easy access to the live lambs coming from the Co-op producers. Further, the Greeley Facility's location ensures the Debtor's ability to distribute products across the United States.

9.     Prior to the Petition Date, the Debtor was working on several fronts to reduce its costs, increase its revenue, and expand profitability.  More specifically, the Debtor sold

a costly New York City facility and operation, which reduced ongoing costs and provided cash to pay down debt owed to CoBank, the Debtor's primary lender.

10.    The Debtor also spent eighteen months marketing and exploring a sale of the Greeley Facility as a going concern continuing the business of the Debtor. The Debtor had executed a letter of intent with an industry leading veal and lamb company (the "**Potential Pre-Petition Buyer**"). The Debtor worked for many months to consummate the sale to the Potential Pre-Petition Buyer both inside and outside of a chapter 11 process. However, despite the Debtor's best efforts, it was not able to close the sale to the Potential Pre-Petition Buyer. Soon thereafter, the Debtor's secured lender, CoBank, refused to extend the loan, issued a default notice and was about to commence a state-court receivership action, which Debtor believes would have shuttered the Greeley Facility and caused a forced liquidation of the Debtor's assets, the loss of 230 jobs and created even greater havoc on the domestic lamb industry, beyond the severe impact of the COVID-19 pandemic.

11.    The Debtor commenced this case to preserve the going concern value of its assets for the benefit of CoBank, creditors, the employees, and the other parties in interest. Fortunately, Debtor has secured another buyer, Greeley FAB, to purchase Debtor as a going concern despite the COVID-19 pandemic and its severe negative impact on the United States economy and the lamb market.

**Professionals Assisting in the Post-Petition Marketing/Sale Process.**

15.    On March 24, 2020, the Debtor filed its *Application to Employ R$^2$ Advisors LLC as Debtor's Financial Advisor Under 11 U.S.C. § 327(a) and Approve Retainer Nunc*

*Pro Tunc to the Date of the Filing of this Application*. (Docket No. 22).  On March 26, 2020, this Court entered an order approving the $r^2$'s employment in this case. (Docket No. 25).  The Debtor anticipates use of **r²** to assist in the administration and execution of the anticipated sale process as detailed below.

16.     Since it was retained, $r^2$ has undergone efforts to prepare the Debtor to proceed with anticipated sale process.  As part of the anticipated sale process, $r^2$ set up an online data room controlled and maintained by $r^2$ (the "**Data Room**").  The Data Room consists of audited and unaudited financial statements, forecasts, budgets, property descriptions, deeds, employment structure and information, asset schedules, operational history, plant and production information, a comprehensive presentation on the Debtor's operations and other confidential information relevant to the Debtor's operations.

17.     $r^2$ has also worked with Debtor's management to compile a comprehensive list of potential strategic purchasers and/or investors in the lamb, meatpacking and protein production business.

18.     The Committee has moved to retain Alliance Management, LLC ("**Alliance**") to assist the Committee as its financial advisor in this case. See *Application For Order Authorizing and Approving Employment of Alliance Management As Financial Advisors to The Official Committee of Unsecured Creditors of Mountain States Rosen LLC Nunc Pro Tunc to April 27, 2020*. (Docket No. 96).

19.     During the past two weeks, Debtor discussed the Greeley FAB Offer and a sale process with CoBank and the Committee.  CoBank and the Committee expressed a view that the Debtor retain an additional professional, besides $r^2$, to market test the Greeley

FAB Offer, specifically recommending the Debtor engage a specific investment banker. Though the Debtor believes $r^2$ is well-qualified and able to lead an effective sale process, the Debtor interviewed CoBank's recommended investment banker on May 4 and 5, 2020, and indicated a willingness to retain them if doing so would secure a consensual sale process with CoBank and the Committee, provided that CoBank would fund the additional fees, costs and expenses of the professional.

20.     The Debtor later learned that CoBank decided the Committee, and not the Debtor, should retain additional professional.  Further, the Debtor is informed that CoBank, the Committee have not yet been able to work out agreeable terms for such an engagement at such additional cost.

21.     CoBank has requested the Debtor defer filing anything regarding the sale. The Debtor has waited more than two weeks while CoBank evaluates various options.  The Debtor believes any further delay would not be beneficial to either the sale process or maximizing the estate including the maximizing the interests of unsecured and creditors other than CoBank and, accordingly, has filed this Motion.  Further, the Debtor sought CoBank's agreement to use cash collateral through July 31, 2020, but CoBank would only agree to such use through June 30, 2020 – the date Greeley FAB proposes as the outside date to close the proposed sale.  Thus, in exercising its reasonable business judgment, the Debtor believes it is necessary proceed with this Motion at this time and invites CoBank and the Committee to work with and collaborate with the Debtor to allow the sale process to move forward in a timely and expeditious manner.

## The Greeley FAB Stalking Horse Offer

12.     In late April  2020, the Debtor received an offer from Greeley FAB for the sale and purchase of substantially all of the Debtor's Assets and for ten million dollars ($10,000,000) as well as assumption of certain liabilities, including but not limited to a PPP Loan (as defined below) in the amount of $3,595,000 (the "**Greeley FAB Offer**"). Greeley FAB is an insider of the Debtor under the meaning of 11 U.S.C. § 101(31).  The terms of the Greeley FAB Offer are memorialized in the Greeley FAB APA attached hereto as **Exhibit A**.

13.     The Debtor notified both CoBank and the Committee about the terms of the Greeley FAB Offer and for more than two weeks has worked to move forward with an agreed sale process but CoBank and Committee are still in the process of seeking to select an additional professional person to advise on the sale process.  The Debtor, upon consultation with its counsel and $r^2$, the Debtor's independent financial advisor, believes the Greeley FAB Offer is fair, reasonable and in the best interest of the estate.  In fact, the Debtor believes the Greeley FAB Offer is superior to the proposed prepetition sale to the Potential Pre-Petition Buyer.  The Debtor decided to accept the Greeley FAB Offer, which is subject to Court approval and to receiving higher and better offers through a competitive bidding process to market test the Greeley FAB Offer.

14.     Although the Debtor believes the Greeley FAB Offer is fair and reasonable and reflects the highest and best value for the Assets as of the date of this Motion, the Debtor proposes to market test and shop the Greeley FAB Offer for potential overbids and in such a case hold an auction (the "**Auction**") in hopes that higher and better offers are

generated for the Assets in order to maximize value for the estate.

15.     Greeley FAB has agreed to allow the Greeley FAB Offer to be subject to the Auction in return for receiving certain buyer protections as discussed in more detail below. Accordingly, the Debtor proposes to sell its Assets to Greeley FAB pursuant to the Greeley FAB APA, subject to higher and better offers through the Auction process.  Greeley FAB has agreed to allow the Greeley FAB APA to be subject to the Auction in return for receiving certain buyer protections as discussed in more detail in the Bidding Procedures Motion and the Greeley FAB APA.

### Sale of the Purchased Assets

16.     The Debtor seeks approval of the sale of substantially all its Assets, including, *inter alia*, unexpired leases, unexpired subleases and executory contracts and personal property all as more fully set forth in the Greeley FAB APA.

17.     Pursuant to the Greeley FAB APA, the Debtor and Greeley FAB propose the following timeline:

- Entry of the Bidding Procedures Order no later than **June 11, 2020.**

- Deadline to (a) object to sale, (b) object to assumption/assignment and cure amounts (as to the Initial Assumed Contracts) no later than **June 15, 2020**.

- Deadline to submit overbids no later than **June 22, 2020**.

- Auction no later than **June 24, 2020**.

- Hearing on the Sale (the "**Sale Hearing**") on or before **June 30, 2020.**

- Closing of Sale no later than **June 30, 2020**.

18.     In light of the extensive efforts to sell this business prior to the bankruptcy filing, the additional efforts that will be made during the proposed sale process, and based upon the current financial condition of the business, the Debtor believes that the Sale and Auction process provides sufficient time to fully expose the Debtor's Assets for sale in the hope of achieving a competitive bidding process.

## Continued Marketing Process

19.     While the Debtor believes the pre- and post-petition marketing and sale processes were thorough, as discussed above, the Debtor will send, or will have sent, notice of the Sale Motion and Bidding Procedures Motion to all parties the Debtor believes may be potentially interested in acquiring the Assets.

20.     To assist with this task, and to ensure that the highest and best price is obtained for the Debtor's Assets, the Debtor retained $r^2$ to solicit for further offers for the Assets.  Since it was retained, $r^2$ has undergone efforts to prepare the Debtor to proceed with anticipated sale process.  Debtor also understand that the Committee may also seek to retain another professional to assist in the sale and marketing effort. As part of the anticipated sale process, $r^2$ set up an online data room controlled and maintained by $r^2$ (the "**Data Room**").  The Data Room consists of audited and unaudited financial statements, forecasts, budgets, property descriptions, deeds, employment structure and information, asset schedules, operational history, plant and production information, a comprehensive presentation on the Debtor's operations and other confidential information relevant to the Debtor's operations.  $r^2$ has also worked with Debtor's management to compile a comprehensive list of potential strategic purchasers and/or investors in the lamb,

meatpacking and protein production business.  The Debtor will continue to respond to inquiries from prospective buyers through the bid deadline approved by the Court for alternative bidders to bid on the Assets.

21.     To maximize the value of its Assets for the benefit of the Debtor's estate and its creditors, the Debtor proposes to implement a competitive bidding process designed to generate maximum recovery.  Accordingly, the Debtor seeks the Court's approval of the Bidding Procedures – set forth in more detail in the Bidding Procedures Motion – to govern the process for the sale of substantially all the Debtor's Assets at the Auction.  The Bid Procedures are currently located in the Data Room and potential buyers are currently anticipating an order from the Court approving the Bid Procedures for the sale process to proceed forward.

## Agreement with Greeley FAB

22.     The Debtor believes consummation of the Sale to Greeley FAB or other successful bidder will provide its creditors and other stakeholders with the best opportunity possible for maximizing the value of the Debtor's Assets.

23.     The following is a summary of the terms and conditions of the Greeley FAB APA.  The description below only summarizes certain provisions of the Agreement and the Sale Order as a convenience to the Court and parties in interest.  In the event of a conflict between the below summary and the Greeley FAB APA, the Greeley FAB APA shall control (capitalized terms are defined in the Greeley FAB APA unless indicated otherwise):

11

a.  **Purchase Price**:  The aggregate purchase price for the sale and purchase of the Included Assets is ten million dollars ($10,000,000), adjusted if necessary, as of the Closing as provided in the Greeley FAB APA, plus assumption of the Assumed Liabilities, including without limitation assumption of the PPP Loan (as defined below).

b.  **Purchased Assets**:  All of the direct and indirect right, title and interest of the Debtor in and to all tangible and intangible assets, properties, rights, claims and Contracts used, useful or held for use in, or related to, the Business, including: all Current Assets, including, but not limited to, accounts receivable, prepaid insurance, prepaid expenses and other current assets related to the Greeley Facility, but excluding all cash other than the proceeds of the Paycheck Protection Program Loan from the Converse County Bank of Douglas, Wyoming to Mountain States/Rosen, LLC, designated Loan No. 7393037, dated April 15, 2020 in the principal amount of $3,595,000.00 (the "**PPP Loan**") including all undistributed and unspent proceeds from the PPP Loan; all Inventory and supplies relating to or located at the Greeley Facility; all Equipment, including, but not limited to, furniture, fixtures, machinery, vehicles, rolling stock, computers and computer equipment, parts, tools, supplies, signage, manuals, training materials and other items of Equipment relating to or located at the Greeley Facility and owned by the Debtor used for the operation of the Greeley Facility; fee simple title to the parcels of Land consisting of the Greeley Facility, together with all rights of way, easements, hereditaments, tenements and other rights appurtenant thereto, including any right, title and interests in and to any streets or other public ways adjacent to the Land and any water or mineral rights owned by, or leased to, the Debtor in relation to the Greeley Facility and any rights pursued or being pursued by the Debtor in relation to the Greeley Facility; all Improvements located on the Land, including but not limited to, the Greeley Facility, and all other structures, systems, fencing, security, and fixtures and all utilities and rights to utilities, including natural gas, electricity, water, municipal wastewater and all connections, taps, permits, licenses and all use rights relating to the utilities held by the Debtor or associated with, and utilized in, the ownership and operation of the Greeley Facility; all of Debtor's rights under those contracts of the Debtor that relate to the Greeley Facility and are required to operate and maintain the Greeley Facility consistent with past practices, as determined by Greeley FAB in its sole discretion, including, among others, (i) that certain Shared Services Agreement (Wastewater), that certain Shared Services Agreement (Steam) and that certain Shared Services Agreement (Blood), each dated as of January 4, 2016 and each by and between Swift Beef Company and the Debtor (collectively, the "Swift Contracts"); all Intellectual Property, including, but not limited to, all domain names, computer programs,

12

software, manuals and related rights; all registrations of trademarks and of other marks, registrations of trade names, labels or other trade rights, and applications for any such registrations; all names or tradenames by which the Greeley Facility or any part thereof may be known including, but not limited to, the trade names related to "Mountain States/Rosen", all copyrights, copyright registrations and applications therefor; all trademarks and other marks, trade names, trade dress, labels and other trade rights, whether or not registered; all inventions, designs, know-how, trade secrets, improvements, formulae and similar assets; all knowledge, know-how, inventions and improvements relating to any equipment, operations of the Greeley Facility, and all license, royalty or other agreements relating to any of the foregoing; all claims and causes of action relating to any of the foregoing, including claims and causes of action for past infringement; and all other intellectual property rights of any character or description including all good will associated with such intellectual property rights, to the extent relating to the Greeley Facility; all Books and Records, including, but not limited to, all lists, records, data bases, or other business information of any kind required by law to be kept and maintained, mailing lists, marketing and sales materials and records, financial and accounting information and records, business forecasts, sales and marketing plans and information manuals, training materials, and similar items, and all books, records, files, computer software, data or databases, telephone numbers, email addresses and fax numbers, correspondence, memoranda, notes and other documents or papers and other evidence thereof that the Debtor maintains or is required to maintain by law or by any third party, to the extent relating to the ownership of the Greeley Facility, if any; and all Permits owned or held by the Debtor relating to the use or ownership of the Greeley Facility, and any and all rights relating thereto and all documentation relating to any Permits.

c.   **Excluded Assets**:  Greeley FAB shall not purchase, and the Debtor shall retain: all cash funds in deposit accounts (other than any remaining proceeds of the PPP Loan) any other personal property owned by the Debtor not specifically listed or described as a purchased asset, any personal property or real property described in the Excluded Assets Schedule of the Disclosure Schedule; all rights or obligations under all contracts of the Debtor other than the Assumed Contracts, including, by way of illustration and without limitation: (i) any employment agreements, Employee Plans (as hereinafter defined) or other employment related contracts or arrangements, (ii) any contract representing any indebtedness, and (iii) any lease for any property or facility; all the claims and causes of action of the Debtor or its estate under 11 U.S.C. §§ 502(d), 544, 545, 547, 548, 550 and 553, any other avoidance actions under the Bankruptcy Code and any commercial tort claims or any proceeds thereof.

13

d. **Assumed Contracts**:  All of Debtor's rights under those contracts of the Debtor relating to the Greeley Facility and required to operate and maintain the Greeley Facility consistent with past practices, as determined by Greeley FAB in its sole discretion, which contracts are set forth on the Assumed Contracts Schedule of the Disclosure Schedule attached to the Greeley FAB APA, which Assumed Contracts include, among others:

 i. that certain Shared Services Agreement (Wastewater) dated as of January 4, 2016, by and between Swift Beef Company and the Debtor;

 ii. that certain Shared Services Agreement (Steam) dated as of January 4, 2016, by and between Swift Beef Company and the Debtor; and

 iii. that certain Shared Services Agreement (Blood) dated as of January 4, 2016, by and between Swift Beef Company and the Debtor;

*provided* that until the entry of the Final Sale Order, Greeley FAB reserves the right to amend the Assumed Contracts Schedule of the Disclosure Schedule in its sole and absolute discretion to add or delete contracts.

e. **Assumed Liabilities**:  Greeley FAB agrees to assume the following liabilities: the PPP Loan including all undistributed and unspent proceeds from the loan, as well as all attributes of the Debtor relating to Small Business Association guarantees, payments, and repayments relating to the Loan (to the extent such attributes are assignable); the obligation and liabilities to process lambs offered to Debtor or Greeley FAB to be processed at the Greeley Facility by Mountain States Lamb Cooperative (or its members) at market prices through July 31, 2020, providing that the Greeley Facility shall be operated at the same or greater capacities as of the date of the Greeley FAB APA and the Mountain States Lamb Cooperative (or its members) must not offer more than the Greeley Facility capacity on a daily basis; those liabilities and obligations arising out of or based upon Greeley FAB's ownership and operation of the Included Assets from and after the Closing Date; and the liabilities and obligations of the Debtor under the Assumed Contracts, but only to the extent such liabilities or obligations arise after or are attributable to periods ending after the Closing Date.

f. **Excluded Liabilities**:  All other obligations, debts, taxes, operating expenses, rent, utilities and other liabilities of the Debtor of any kind, character or description, whether accrued, absolute, contingent or otherwise, shall not be assumed by Greeley FAB and shall be retained by the Debtor.

14

Without limiting the foregoing, Greeley FAB shall not assume, and the Debtor shall retain: all loans, accounts and other amounts payable or to become payable by the Debtor, whether to financial institutions, officers, stockholders, affiliates or otherwise to any other person, including any accounts payable to any and all vendors with respect to any period of time prior to or attributable to periods ending on or before the Closing Date; all liabilities and obligations of the Debtor in respect of any Taxes; any liabilities or obligations under the Assumed Contracts with respect to any period of time prior to or attributable to periods ending on or before the Closing Date; all liabilities and obligations under any contracts that are not Assumed Contracts. In particular, but without limitation, Greeley FAB shall not assume any liabilities of the Debtor under, and Greeley FAB shall not be deemed a successor company to the Debtor in connection with, any Employee Plan, collective bargaining agreement or other employment related arrangement to which the present or former employees of the Debtor are or were entitled (including any severance arrangements or pension plans or obligations whether the Debtor incurred such obligations as a result of the Debtor employing Employees at current or formerly owned facilities, or the Debtor assumed or was assigned such obligations), and Greeley FAB shall have no obligation to employ any of the Debtor's employees in connection with or after the transactions contemplated by the Greeley FAB APA; all liabilities and obligations relating in any manner to any of the Excluded Assets. The Debtor shall be responsible for paying all costs of cure necessary for the assumption and assignment of the Assumed Contracts to Greeley FAB as of the Closing Date.

g.  **Deposit**: $250,000.00 shall be submitted to an escrow agent and the escrow agent shall hold the deposit as security for the performance of the parties' obligations under the Greeley FAB APA.

h.  **Representations and Warranties; Covenants**: The representations and warranties and covenants are customary for a transaction of this type, including, without limitation, representations and warranties regarding the authority to enter into the Sale transaction, contract cure obligations, the best efforts of the parties, notices and consents, access to information and the risk of loss.

i.  **Bidding Procedures**: The Greeley FAB APA contemplates Court approval of bidding procedures to govern the Auction sale. The proposed bidding procedures are discussed in the Bidding Procedures Motion.

j.  **Break-Up Fee**: In the event that the Greeley FAB APA is terminated at any time before a Closing occurs with Greeley FAB because the Debtor has entered into an agreement with respect to a Sale of the Assets with an

alternate entity, the Debtor shall pay Greeley FAB a breakup fee in the amount of no less than $75,000 and up to an additional $75,000 for out-of-pocket expenses relating to (collectively, the "Break-Up Fee") which shall be paid from the proceeds from the Sale of the Assets upon the Closing of the Sale to the alternate entity.

k.  **Closing Date**:  Upon the terms and subject to the conditions set forth in the Greeley FAB APA, the Closing of the sale and purchase of the Included Assets shall take place at such place and time and/or on such date as the Debtor and Greeley FAB may mutually agree but in no event later than June 30, 2020.

l.  **Termination Provisions**:  The Greeley FAB APA may be terminated: (i) at any time before the Closing: if Closing has not occurred by 11:59 p.m. EST on the Outside Date; by the mutual written consent of Greely FAB and the Debtor; (ii) by Greeley FAB by written notice to the Debtor if: there has been a material breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by the Debtor under the Greeley FAB APA that would give rise to the material failure of any of the conditions specified therein and such material breach, inaccuracy or failure has not been cured by the Debtor within 3 days of the Debtor's receipt of written notice of such breach from Greeley FAB; or any of the conditions set forth in Section 7.2 of the Greeley FAB APA shall not have been, or if it becomes apparent that any of such conditions will not be, fulfilled by the Outside Date, unless such failure shall be due to the failure of Greeley FAB to perform or comply with any of the covenants, agreements or conditions to be performed or complied with by it before the Closing Date.

m.  **Bankruptcy Rule 6004/6006 Waiver**.   The proposed Sale Order provides that, upon entry, the Sale Order will be immediately enforceable, notwithstanding Bankruptcy Rules 6004 and 6006.  As discussed herein, the Sale and prompt consummation thereof are in the best interest of the Debtor and its estate in order to maintain and otherwise maximize the value of the Debtor's Assets for the benefit of the estate and its stakeholders and to comply with certain timing deadlines as discussed above.

n.  **Record Transfer and Access**.  The Greeley FAB APA provides for the transfer to the Purchaser of all Books and Records.

24.    The Debtor believes that the sale of its Assets to Greeley FAB or other successful bidder is in the best interests of the Debtor's estate and its creditors.  The Debtor further believes that obtaining the Greeley FAB Offer, marketing the Assets with the

16

assistance of r², and holding the Auction on the date specified by the Court will result in the highest or otherwise best consideration for the Debtor's Assets.

25.    The Debtor has examined the alternatives to a sale of its Assets and has determined that, considering the Debtor's financial situation, and value of the Assets, a more viable alternative to sale of the Assets does not exist.  The Debtor determined that the sale of the Assets optimizes value for its estate and creditors.

26.    For the reasons stated above, and in light of the obvious benefits to the estate, the Debtor has determined, in the exercise of its business judgment, to consummate the proposal submitted under the Greeley FAB APA with Greeley FAB or, if applicable, another bidder in the event that the Debtor receives a higher or otherwise better bid to the transaction set forth in the Greeley FAB APA.

## Relief Requested

27.    Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Section 105(a) provides in relevant part that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

28.    A sale of the debtor's assets should be authorized pursuant to § 363 if a sound business purpose exists for doing so.  *See, e.g.*, *In re Allen,* 607 Fed.Appx. 840, No. 14-1242 (10th Cir. May 27, 2015) (citing *In re Caste, Inc*., 312 B.R. 426, 428 (Bankr. D. Colo. 2004)); *In re Martin*, 91 F.3d 389, 395 (3rd Cir. 1996) (citing *Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991)); *In re Abbotts Dairies of Pennsylvania,*

*Inc.*, 788 F.2d 143 (3rd Cir. 1986); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th

Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063 (2nd Cir. 1983).

29.     The Debtor has proposed the sale of its Assets after thorough consideration

of all viable alternatives and has concluded that the Sale is supported by many sound

business reasons.  The Debtor has engaged in an active effort to sell its Assets prior to the

filing of this case and has proposed Bidding Procedures designed to maximize the purchase

price realized from the sale of its Assets. Further, the Debtor believes the prepetition and

post-petition marketing of the Debtor up to the proposed deadline to submit competing bids

for its Assets will provide a sufficient opportunity to generate any potential overbids and

maximize recovery for the Debtor's creditors.  Specifically, other potential buyers and

parties that have expressed interest in the acquisition of the Debtor's Assets will be served

with this Sale Motion and Bidding Procedures Motion and/or notice thereof.

30.     Based on the foregoing, the sale of the Debtor's Assets is supported by sound

business reasons and is in the best interests of the Debtor and its estate.  Accordingly, the

Debtor requests approval under § 363(b) of the Sale to Greeley FAB or other successful

bidder, as set forth herein.

### The Proposed Sale Satisfies the Requirements of Section 363(f) of the Bankruptcy Code for a Sale Free and Clear of Liens, Claims, and Interests

31.     Section 363(f) of the Bankruptcy Code provides:

The trustee may sell property under subsection (b) or (c) of this section free
and clear of any interest in such Property of an entity other than the estate,
only if –

(1) applicable nonbankruptcy law permits sale of such property free
and clear of such interest;

      (2) such entity consents;

      (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

      (4) such interest is in a bona fide dispute; or

      (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

    32.    Section 363(f) of the Bankruptcy Code is drafted in the disjunctive.  Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the sale of the Debtor's Assets free and clear of all of the applicable liens, claims and encumbrances, except with respect to any liens, claims and encumbrances permitted under the Greeley FAB APA.  *See Citicorp Homeowners Services, Inc. v. Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988).  The Debtor submits that each lien, claim, and encumbrance that is not an Assumed Liability – as that term is defined in the Greeley FAB APA – satisfies at least one of the five conditions of § 363(f), and that any such lien, claim, or encumbrance will be adequately protected by either being paid in full at the time of closing, or by having it attach to the sale proceeds, subject to any claims and defenses the Debtor may possess with respect thereto.  The Debtor accordingly requests authority to convey its Assets to Greeley FAB or other successful bidder(s), free and clear of all liens, claims, and encumbrances except for the liens, claims, and encumbrances that expressly permitted under the terms of the Greeley FAB APA, with such liens, claims, and encumbrances to attach to the sale proceeds, with the same validity (or invalidity), priority and perfection as existed immediately prior to the Sale, subject to the terms of the Greeley FAB APA and

the Sale Order.

33.    Accordingly, this Court should approve the Sale of the Debtor's Assets to
Greeley FAB or other successful bidder free and clear of liens, claims, and encumbrances
under § 363(f), and any potential claimants should be compelled to look exclusively to the
proceeds of the Sale for satisfaction of their claims.

**Good Faith Under Section 363(m) of the Bankruptcy Code;**
**Sale Not in Violation of Section 363(n) of the Bankruptcy Code**

34.    Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection
> (b) or (c) of this section of a sale or lease of Property does not affect the
> validity of a sale or lease under such authorization to an entity that purchased
> or leased such Property in good faith, whether or not such entity knew of the
> pendency of the appeal, unless such authorization and such sale or lease were
> stayed pending appeal.

11 U.S.C. § 363(m).

35.    Section 363(n) of the Bankruptcy Code, among other things, provides, in
turn, that a trustee may avoid a sale under such section if the sale price was controlled by
an agreement among potential bidders at the sale.  *See* 11 U.S.C. § 363(n).  Although the
Bankruptcy Code does not define "good faith," the Third Circuit in *In re Abbotts Dairies
of Pennsylvania, Inc*., 788 F.2d 143 (3rd Cir. 1986), held that:

> [t]he requirement that a Buyer act in good faith . . . speaks to the integrity of
> his conduct in the course of the sale proceedings.  Typically, the misconduct
> that would destroy a Buyer's good faith status at a judicial sale involves
> fraud, collusion between the Buyer and other bidders or the trustee, or an
> attempt to take grossly unfair advantage of other bidders.

*Id*. at 147 (citations omitted).

36.    The Greeley FAB APA was negotiated at arms' length and Greeley FAB has

acted in good faith, without collusion or fraud of any kind, and in compliance with the

*Abbotts Dairies* standards.  Neither the Debtor nor Greeley FAB (to the best of the Debtor's

knowledge) has engaged in any conduct that would prevent the application of § 363(m) or

otherwise implicate § 363(n) with respect to the consummation of the Sale or the transfer

of the Debtor's Assets to Greeley FAB.  In addition, if a party other than Greeley FAB is

the successful bidder, the Debtor intends to make an appropriate showing at the Sale

Hearing that the purchase agreement with the other successful bidder is a negotiated, arms'

length transaction, in which the successful bidder at all times has acted in good faith under

and otherwise in accordance with such standards.

37.     The Debtor thus requests that the Court find that Greeley FAB or the

successful bidder has purchased the Assets in good faith within the meaning of § 363(m)

and is entitled to the protections of §§ 363(m) and (n) of the Bankruptcy Code.

**<u>Authorization of Assumption and Assignment of Contracts</u>**

38.     As required by the Greeley FAB APA, and in order to enhance the value to

the Debtor's estate, the Debtor requests approval of the potential assumption and

assignment to Greeley FAB or the other successful bidder of certain unexpired leases and

subleases that have been identified as Assumed Contracts upon the closing of the

transactions contemplated under the Greeley FAB APA.

39.     Pursuant to the Greeley FAB APA, the Debtor is responsible for payment of

all cure amounts required to be paid to the counterparties to the Assumed Contracts

assumed and assigned (each a "**Counterparty**" and collectively, the "**Counterparties**")

under § 365(b)(1).

40.     The Assumed Contracts are those contracts or leases that are to be assumed by the Debtor and assigned to Greeley FAB or the other successful bidder as part of the sale transaction under the Greeley FAB APA.  The Debtor further requests that the Sale Order provide that the Assumed Contracts will be assigned to, and remain in full force and effect for the benefit of, Greeley FAB or the other successful bidder, notwithstanding any provisions in the Assumed Contracts, including those described in §§ 365(b)(2) and (f)(1) and (3), that prohibit such assignment.

41.     Debtor is aware that Greeley FAB is seeking to assume the following executory contracts (and may designate others as well) and the Debtor believes the cure amount for each such contract is as set forth:

   i.   that certain Shared Services Agreement (Wastewater) dated as of January 4, 2016, by and between Swift Beef Company and the Debtor – cure amount - $33,616.19 ;

   ii.  that certain Shared Services Agreement (Steam) dated as of January 4, 2016, by and between Swift Beef Company and the Debtor – cure amount  -  $100,176.39 ; and

   iii.  that certain Shared Services Agreement (Blood) dated as of January 4, 2016, by and between Swift Beef Company and the Debtor – cure amount - $ 0

(collectively the "**Initial Assumed Contracts**").

42.     Pursuant to the Bidding Procedures Motion, the Debtor proposes that a list (or lists) of Assumed Contracts, if any, in addition to Initial Assumed Contracts be served on all counterparties to such contracts and leases no later than two (2) business days after entry of the Bidding Procedures Order. The parties to the Initial Assumed Contracts are being served a copy of this Motion and the Notice filed contemporaneously herewith.

43. Section 365(f) of the Bankruptcy Code provides, in pertinent part, that:

The trustee may assign an executory contract or unexpired lease of the debtor only if –

(A) the trustee assumes such contract or lease in accordance with the provisions of this section; and

(B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2). Under § 365(a), a debtor "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Section 365(b)(1), in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor, providing that:

(b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee --

(A) cures, or provides adequate assurance that the trustee will promptly cure, such default;

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

44. Although § 365 does not set forth standards for courts to apply in determining whether to approve a debtor in possession's decision to assume an executory contract, courts have consistently applied a "business judgment" test when reviewing such a decision. *See, e.g., Group of Institutional Investors v. Chicago, Milwaukee, St. Paul &*

23

*Pacific Railroad Co.*, 318 U.S. 523, 550 (1953); *Matter of Talco, Inc.*, 558 F.2d 1369, 1173 (10th Cir. 1977); *In re J.H. Land & Cattle Co., Inc.,* 8 B.R. 237, 238 (Bankr. W.D. Okla. 1981); *In re Crescent Oil Co., Inc.,* 2010 WL 2721878, 3 (Bankr. D. Kan. 2010); *see also Nat'l Labor Relations Bd. v. Bildisco and Bildisco (In re Bildisco)*, 682 F.2d 72, 79 (3rd Cir. 1982) (stating that "the usual test for rejection of an executory contract is simply whether rejection would benefit the estate, the 'business judgment' test"). The business judgment standard mandates that a court approve a debtor's business decision unless the decision is the product of "bad faith, whim or caprice." *Lubrizon Enters v. Richmond Metal Finishes,* 756 F.2d 1043, 1047 (4th Cir. 1980).

45.     A debtor satisfies the "business judgment" test when it determines, in good faith, that assumption of an executory contract will benefit the estate and the unsecured creditors. *In re FCX, Inc.*, 60 B.R. 405, 411 (Bankr. E.D.N.Y. 1986). The potential assumption and assignment of the Assumed Contracts, set forth in the Greeley FAB APA, will be a necessary part of the deal that Debtor has struck with Greeley FAB or other successful bidder and, as stated above, will benefit the estate of Debtor.

46.     As set forth above, with respect to Initial Assumed Contracts and any other Assumed Contracts to be potentially assumed and assigned pursuant to the Agreement, the Debtor has as it relates to those or will send notices to all Counterparties in connection with the Court's approval of the Bidding Procedures, thereby notifying such Counterparties of the potential assumption by the Debtor and assignment to Greeley FAB or the successful bidder of the Assets at the Sale Hearing (the "**Cure Notices**"). The Cure Notices for any other Assumed Contracts shall set forth the "cure" amounts owing on each of the Assumed

Contracts, according to Debtor's books and records and, in accordance with the provisions set forth in the Bidding Procedures, and as it relates to Initial Assumed Contracts the amounts set forth above as cure amounts as the amounts required to be paid pursuant to § 365(b)(1) (the "**Cure Amounts**").  As it relates to the Initial Assumed Contracts, objections to Cure Amounts or adequate assurance of future performance shall be filed on or before the deadline for objections to this Motion.  As it relates to other Assumed Contracts, the Bidding Procedures Motion proposes that objections, if any, to either the Cure Amounts or the assumption or assignment of other Assumed Contracts to Greeley FAB or adequate assurance of future performance be filed on or before a date to be set by the Court. Objections to the adequate assurance of future performance of a successful bidder (other than Greeley FAB), may be raised as set forth by the date set by the Court.

47.     Counterparties to other Assumed Contracts will have a sufficient opportunity to file an objection to the proposed Cure Amounts set forth in the Cure Notices.  To the extent no objection is filed regarding a particular Cure Amount, such Cure Amount shall be binding on the applicable contract or lease Counterparty.  The payment of the Cure Amounts specified herein as it relates to Initial Assumed Contracts or in the Cure Notices as it relates to other Assumed Contracts (or a different amount either agreed to by the Debtor, or resolved by the Court as a result of a timely-filed objection filed by a contract or lease counterparty) will be in full and final satisfaction of all obligations to cure defaults and compensate the counterparties for any pecuniary losses under such contracts or leases pursuant to § 365(b)(1), unless the Debtor determines (with the consent of Greeley FAB or successful bidder) that a particular lease or contract is not truly executory, and does not

need to be cured to transfer the lease or contract to the successful bidder or Greeley FAB.

48.     Cure Amounts disputed by any Counterparty will either be considered by the Court either at the Sale Hearing or at some later date as may be scheduled by the Court to determine contested objections regarding Cure Amounts, that have not been resolved in advance or at the Sale Hearing.  With respect to payment of Cure Amounts, the Debtor shall bear and pay the entire amount of such cure costs.

49.     Greeley FAB or other successful bidder is responsible for providing evidence of "adequate assurances of future performance" to the extent required in connection with the assumption and assignment of Assumed Contracts.  The meaning of "adequate assurance of future performance" for the purpose of the assumption of executory contracts and unexpired leases pursuant to § 365 depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean an absolute assurance that debtor will thrive and pay rent); *see also In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985).  If necessary, Greeley FAB or the other successful bidder shall provide evidence of its ability to provide adequate assurances to Counterparties to the Assumed Contracts at the Sale Hearing.  Moreover, any successful bidder will be required to provide evidence that the bidder can provide adequate assurance of future performance with respect to Assumed Contracts at the time it submits its bid.

## Notice

26

50.     A copy of this Sale Motion and notice of an opportunity to object will be provided to all parties on the Limited Service List previously approved by the Court, consisting of: (1) the Debtor's prepetition secured creditors; (2) the Debtor's top twenty (20) unsecured creditors; (3) all priority creditors; (4) utility providers; (5) any committee appointed under § 1102; (6) any counsel to the committee appointed under § 1102; (7) the Office of the United States Trustee; (8) counterparties to the Initial Assumed Contracts; (9) any party against whom relief is sought by the particular intended action; and, (9) those who have formally appeared and requested notice. *See Order Granting Ex Parte Motion to Limit Notice*, Dkt. No. 11.  In addition, notice of this Sale Motion and an opportunity to object will be provided to all parties on the Debtor's creditor matrix.  The Debtor respectfully submits that such notice is sufficient, and requests that the Court find that no further notice of the relief requested herein is required.

51.     The Debtor requests, pursuant to Bankruptcy Rules 6004(h) and 6006(d), that the order approving this Sale Motion become effective immediately upon its entry.

## Conclusion

52.    The Debtor's proposed sale of its Assets as described in this Sale Motion is supported by sound business reasons, as set forth herein.  The proposed sale is proper, necessary and serves the best interests of the Debtor, its estate and creditors, and all parties in interests.  The Debtor thus requests that the Court approve the proposed Sale of its Assets free and clear of all interests, liens, claims, and encumbrances, as requested, to Greeley FAB or other Successful Bidder.

**WHEREFORE**, the Debtor respectfully requests that this Court grant this Sale Motion by entering the attached proposed order: (i) approving the Greeley FAB APA and authorizing the sale of the Debtor's Assets to Greeley FAB or other successful bidder; (ii) authorizing the sale of the Assets free and clear of all liens, claims, rights, encumbrances and other interests; (iii) authorizing the assumption and assignment of Assumed Contracts identified in the Greeley FAB APA; (iv) approving the form and manner of notice of this Sale Motion, and of the proposed sale and the assumption and assignment of Assumed Contracts identified in the Greeley FAB APA and establishing Cure Amounts therefore; and, (v) granting such other and further relief as is just and proper.

Dated: May 20, 2020

Respectfully submitted,

MARKUS WILLIAMS YOUNG AND
HUNSICKER LLC

By:  /s/ *Bradley T. Hunsicker*
Bradley T. Hunsicker (WY Bar No 7-4579)
2120 Carey Avenue, Suite 101
Cheyenne, WY 82001
Telephone: 307-778-8178

28

Facsimile: 303-830-0809
Email: bhunsicker@markuswilliams.com

*Counsel for the Debtor and Debtor-in-Possession Mountain States Rosen, LLC*