Brent R. Cohen, Esq. (Wyo. Bar No. 5-2008)
Lewis Roca Rothgerber Christie LLP
1200 17th Street, Suite 3000
Denver, CO 80202
Telephone: 303-623-9000
Facsimile: 303-623-9222
E-mail: bcohen@lrrc.com

*Counsel for JBS U.S.A. Food Company and Swift Beef Company*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| In re: | ) Case No. 20-20111 |
| MOUNTAIN STATES ROSEN, LLC, | ) Chapter 11 |
| Debtor. | ) Honorable Cathleen D. Parker |

### JBS'S BRIEF IN SUPPORT OF SALE OF DEBTOR'S ASSETS

JBS U.S.A. Food Company, along with its subsidiary, Swift Beef Company ("JBS"), by and through its undersigned attorneys, hereby submits its Brief in Support of Sale of Debtor's Assets, and states as follows:

### PRELIMINARY STATEMENT

1. The issues to be considered by the Court with respect to the Debtor's Sale Motion (hereinafter defined) are quite simple; did the Debtor conduct the Auction[1] in compliance with the Bidding Procedures, approved by order of this Court, and was the selection of JBS as the highest and best bid consistent with the exercise of the Debtor's reasonable business judgment. Based on the record, the answer to both these questions is resoundingly, yes.

---

[1] Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the Bidding Procedures Order (hereinafter defined).

- 1 -

2. Yet, Greeley FAB, LLC ("Greeley FAB"), an insider of the Debtor who was on both sides of key transactions in this case, wants to misdirect the Court's attention from the clear terms of its own order and established case law regarding the lack of standing of disgruntled bidders, to its own inconsistent positions taken before this Court with respect to the PPP Loan, and significant unknowns, all to upset the results of the Auction that was properly conducted by the Debtor. Indeed, Greeley FAB is nothing more than a disgruntled bidder who tried to change the rules of the Auction only when it became clear they could not financially compete with JBS's bid.

3. For these reasons, and others set forth in more detail below, Greeley FAB should not be permitted to disrupt the process that was established by clear and unambiguous language in the Court's Bidding Procedures Order, for which Greeley FAB, an insider of the Debtor, was intimately aware, simply because they lost the Auction. Doing so would impose a grave injustice on JBS and others who relied on the order of this Court and would significantly weaken the sanctity of the 363 sales process and the Debtor's business judgment. Therefore, the Court should deny Greeley FAB's objection to the Sale Motion and exclude any evidence they attempt to submit in support thereof.

**RELEVANT BACKGROUND**

4. On March 19, 2020 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

A.   **The PPP Loan**

5. Approximately one month after the Petition Date, on April 21, 2020, the Debtor filed a *Motion to Obtain Post-Petition Unsecured Credit Under the Coronavirus Aid, Relief, and Economic Security Act Paycheck Protection Program and Notice and Opportunity to Object* [Doc. No. 68] (the "PPP Motion"). Pursuant to the PPP Motion, the Debtor sought approval to enter into

111745379.1

a promissory note (the "PPP Note") from Converse County Bank ("CCB") in the amount of $3,595,000 issued under the CARES Act (the "PPP Loan"). Notably, the PPP Note was executed on behalf of the Debtor by Frank N. Moore and Bradley Graham. See PPP Motion at Ex. 1.

6. As stated in the PPP Motion, the Debtor, through Mr. Moore, sought approval of the PPP Loan because the amounts thereunder would be forgiven if the funds were used for specified purposes, such as employee wages. For instance, the PPP Motion provides as follows.

- "For eligible borrowers, a portion, and potentially all, of the amount of funds borrowed under this program may be **forgiven** without payment." PPP Motion at ¶ 8 (emphasis added).

- "The loan will be fully **forgiven** if the funds are used for payroll costs, interest on mortgages, rent, and utilities (due to likely high subscription, at least 75% of the forgiven amount must have been used for payroll). **Forgiveness** is based on the employer maintaining or quickly rehiring employees and maintaining salary levels. **Forgiveness** will be reduced if full-time headcount declines, or if salaries and wages decrease." Id. at ¶ 11(emphasis added).

- The main purpose of the PPP is to fund a borrower's payroll expenses. Debtor intends to primarily use the proceeds of the PPP loan to fund its payroll and related expenses. If Debtor continues to employ its current employees, the PPP allows for the portion of the loan used to pay those employees and related benefits and certain other operating expenses to be **forgiven**. Id. at ¶ 18 (emphasis added).

- Further, the PPP loan will benefit all of the creditors of the estate because: • The loan will be **forgiven** if used for payroll and related expenses and benefits as well as utilities and certain other operating expenses, which inures to the benefit of all parties in interest. Id. at ¶ 20 (emphasis added).

- Since payments on the PPP loan will be deferred until at least 6 months after funding, it will only positively affect Debtor's cash flow in this case. The loan will be repaid in the ordinary course of Debtor's business, in accordance with the terms of the loan, to the extent it is not entirely **forgiven**. Id. at ¶ 21 (emphasis added).

7. Accordingly, as of April 21, both the Debtor and Mr. Moore were of the opinion that the PPP Loan would be forgiven.

8. With no objection being filed with respect to the PPP Motion, CCB took it upon themselves to file a *Response* to the PPP Motion [Doc. No. 107] (the "CCB Response"). The CCB

Response, is, gently speaking, a "protective" filing. Further, the CCB highlights the driving decision for the Debtor to seek the PPP Loan, that being Mr. Moore. For example, the CCB Response states that "[t]he Bank's involvement and assistance to the Debtor began on March 31, 2020, when Frank Moore, CEO of Mountain States Rosen, approached CCB about a PPP Loan for the Debtor, and his belief that bankrupt entities were eligible for such Loans." CCB Response at p. 2. The CCB Response further highlights Mr. Moore's active participation in obtaining the PPP Loan from CCB. See CCB Response at Exhibit 2 (timeline of events noting Mr. Moore's communication with CCB and Senator Enzi); Exhibit 4 (email correspondence between CCB and the SBA with a copy to Mr. Moore); and Exhibit 5 (CCB's letter to Mr. Moore requesting return of the PPP Loan per the SBA request).

**B.    The Sales Process**

9. On May 20, 2020, the Debtor filed its *Motion of the Debtor for Entry of an Order (A) Approving Bid Procedures for the Sale of Substantially All of the Debtor's Assets; and (B) Approving Break-Up Fee* [Doc. No. 129] (the "Bidding Procedures Motion").

10.    On the same day, the Debtor filed its Motion for an *Order (A) Approving Asset Purchase Agreement and Authorizing the Sale of Substantially all of the Debtor's Assets; (B) Authorizing the Sale of Assets Free and Clear of All Liens, Claims, Rights, Encumbrances and Other Interests pursuant to Bankruptcy Code Sections 363(b), 363(f) and 363(m); (C) Assuming and Assigning Certain Executory Contracts and Unexpired Leases Pursuant to Bankruptcy Code Section 365; and (D) Granting Related Relief*, [Doc. No. 131] (the "Sale Motion").

11.    Pursuant to the Sale Motion, the Debtor sought approval to sell substantially all of its assets to Greeley FAB, an insider of the Debtor, as a stalking horse bidder, subject to higher and better offers solicited pursuant to the Bidding Procedures Order. The Greeley FAB asset

purchase agreement attached to the Sale Motion is signed by Mr. Moore on behalf of Greeley FAB and Mr. Graham on behalf of the Debtor.

12. On June 17, 2020, the Court entered its *Order (A) Approving Bid Procedures in Connection with the Sale of Substantially all of the Debtor's Assets, (B) Approving Form and Manner of Notice Thereof, and (C) Scheduling an Auction and a Sale Hearing* ("Bidding Procedures Order"). [Doc. No. 174] In the Bidding Procedures Order, the Court found that the Bid Procedures, attached as Exhibit 1 thereto, "were negotiated by the parties at arms' length and in good faith by the Debtor." See Bidding Procedures Order, ¶ F. The Court thus approved the Bid Procedures and specified that they "shall govern the submission, receipt, and analysis of all Bids relating to the proposed sale of the Assets." See Bidding Procedures Order, ¶ 8.

13. The Bidding Procedures Order also approved certain notices attached thereto as exhibits, which provided parties in interest details as to the conduct of the Auction and submission of bids. See *Notice of Bid and Auction Procedures, Sale Hearing, Cure Amount Procedures and Objection Deadline Regarding Sale of Debtor's Operation and Assets* (the "Auction Procedures Notice"). The Auction Procedures Notice stated that Greeley FAB's stalking horse bid was $10,000,000 in cash and the assumption of the PPP Loan, yet, attributed no valuation of such assumption. See Notice of Auction Procedures, ¶ 1(b). Accordingly, the Notice of Auction Procedures set forth a required overbid to the stalking horse bid of $10,100,000, consistent with the $100,000 Auction bid increments. See Id., ¶¶ 3(b)(v) and 5(c) respectively.

14. On June 24, 2020, the Debtor's pre-petition lender, CoBank, ACB ("CoBank") filed a *Limited Objection* to the Sale Motion [Doc. 184] (the "CoBank Objection"). The CoBank Objection further reveals Mr. Moore's involvement, providing that:

> During the two weeks before the Petition Date, the Debtor's Chairman, Frank Moore, formed the Greeley FAB, LLC entity and submitted an offer to CoBank on March 10, 2020,

- 5 -

111745379.1

to purchase for $12.575 million CoBank's loan secured by the Debtor's assets. This offer represented that "Bradley Graham is the chief executive officer of [Greeley FAB]". The Debtor's CEO, Mr. Graham, executed the offer on behalf of Greeley FAB.

After the Petition Date, in late April 2020, the Debtor received a new offer from the Debtor's insiders, through their Greeley FAB entity, to purchase substantially all of the Debtor's assets— the Greeley FAB Offer. In submitting this offer, the Debtor's Chairman, Mr. Moore, executed the Greeley FAB APA on behalf of Greeley FAB.

See CoBank Objection, ¶¶ 5-6.

15. Therefore, if CoBank's assertions are correct, as JBS suspects they are, Mr. Moore pursued and executed the PPP Loan on behalf of the Debtor <u>after</u> he formed Greeley FAB and <u>after</u> he and Greeley FAB were pursuing acquisition of the Debtor's assets.

**C.   The Auction**

16. On or about June 29, 2020, JBS determined to submit an offer to purchase the Debtor's assets pursuant to the Bidding Procedures Order. In preparation of its bid formation, JBS conducted an internal analysis on whether PPP loans were legally assignable, the impact on the forgiveness of such assignment, and whether (as opposed to the newly formed insider) JBS, as a subsidiary of a billion dollar enterprise, could assume such loan and seek forgiveness thereof by the SBA. From JBS's perspective, there was too much uncertainty in an attempted assumption of the PPP Loan but, more importantly, there was no rationale business justification for JBS (or any truly independent third party) to assume the obligation to repay a loan for which it had received no funds or other benefit. Therefore, JBS decided to exclude assumption of the PPP Loan as part of its bid and thus submitted a qualified all cash bid of $10,250,000.

17. The Auction for the assets described in the Bidding Procedures Motion took place on July 9, 2020. At the beginning of the Auction, the Debtor, through counsel, announced for the first time, that the Debtor valued Greeley FAB's assumption of the PPP Loan at $1,250,000 based on a 40% risk factor and thus determined that Greeley FAB's bid, now valued at $11,250,000, was

- 6 -

the initial highest qualified bid. JBS objected to such valuation while Greeley FAB remained silent. Notwithstanding its objection and without waiving such objection, JBS determined to continue to participate in the Auction and increased its bids based on the Debtor's valuation. Greeley FAB continued to increase its cash bid also based on this valuation, without objection. It was not until several hours later and the fourth round of bidding, when JBS submitted an all cash bid of $14,250,000, that Greeley FAB objected to the previous announced PPP Loan valuation. Only then did Greeley FAB demand that its assumption of the PPP Loan be valued at 100% of the PPP Loan, thus artificially increasing the total non-cash value of its bid to an amount of $3,595,000 and its total bid amount to $16,395,000.

18. At the conclusion of the Auction, the Debtor, in consultation with the Creditors Committee and CoBank, designated JBS's bid as the highest and best. Greeley FAB was determined to be the backup bidder.

19. Pursuant to the Bidding Procedures Order, a hearing on the Sale Motion and related matters has been scheduled for July 16, 2020 at 1:30 p.m.

### D. Greeley FAB's Objection to the Auction Results

20. On July 10, 2020, Greeley FAB filed its Schedule of Proposed Exhibits and Witnesses in Regard to Hearing Set for July 16, 2020. [Doc. No. 232]

21. A mere two days before the Sale Hearing, realizing that a disgruntled bidder does not have standing to object to the conclusions of an auction, Greeley FAB acquired a *de minimis* general unsecured claim in a transparent attempt to provide it standing it otherwise would not have.

22. That same day, only two days before the Sale Hearing, Greeley FAB, an insider of the Debtor, submitted a lengthy *Objection to the Sale of Debtor's Assets at Auction of July 9, 2020* [Doc. No. 254] (the "Greeley FAB Objection").

**ARGUMENT**

23. Greeley FAB is neither entitled to object to the Sale Motion, nor put on any evidence in opposition thereof. Greeley FAB is nothing more than a disgruntled bidder that inappropriately manufactured standing at the 11th hour to oppose the sale of the Debtor's assets to JBS because it was outbid.

24. Moreover, Greeley FAB's actions are, among other things, in violation of this Court's Bidding Procedures Order that provide that (a) the Debtor has the <u>exclusive</u> right to value any non-cash consideration, such as the PPP Loan assumption, and (b) the losing bidder has <u>no</u> right to object to any other bid being determined to be the highest and best bid. In short, what Greeley FAB is attempting to do is retroactively amend the Bidding Procedures Order for the sole purposes of having them declared the highest and best bid.

25. The sole basis for such opposition is the Debtor's valuation of Greeley FAB's PPP Loan assumption as part of its bid. The Debtor, in its Authorized Discretion, valued the risk of such assumption at 40%, without an additional discount, and thus attributed it a value of $1,250,000. Greeley FAB did not oppose such valuation until the fourth round of bidding. Indeed, when it could no longer financially compete with JBS, Greeley FAB switched gears and opposed - for the first time - the Debtor's 40% valuation and demanded a 100% ($3,590,000) value be added to its bid to outbid JBS. Putting aside that this Court's order prevents such opposition, numerous unknowns regarding the PPP Loan and its assumption exist which fundamentally prevent Greeley FAB from asserting an entitlement to a 100% assumption valuation as it only now does.

### A. Greeley FAB Lacks Standing

26. As a general rule, an unsuccessful bidder at a bankruptcy sale is without standing to object to a properly conducted sale. *Kabro Associates of West Islip, LLC v. Colony Hill Associates*, 111 F.3d 269, 273 (2nd Cir. 1997); *Spitze v. Nitschke*, 528 B.R. 874, 881-882 (D. E.D. Wis. 2015); *In re NEPSCO, Inc.*, 36 B.R. 25, 26-27 (Bankr. Maine 1983). Greeley FAB is well aware of this case law, recognized in almost every jurisdiction in the county, which is why Greeley FAB, after its failed Auction and a mere two days before the Sale Hearing, purchased a small unsecured claim so that it could claim "creditor" status.

### B. The Bidding Procedures Prevent Greeley FAB Disgruntled Bidder Objection

27. As stated above, the matters before the Court are very straight forward and the Court should not be persuaded by Greeley FAB's completely unsubstantiated claims, claims which are entirely inconsistent with positions previously taken in this case. The fact is, the approved Bid Procedures, which Greeley FAB presumably approved as an insider and the stalking horse bidder, specifically prohibit Greeley FAB's attempted challenge to the Debtor's selection, in its Authorized Discretion, of the JBS bid as the highest and best bid. Section 5(c) of the Bid Procedures provides, in part:

> The Debtor in Its Authorized Discretion, upon consultation with CoBank and the Committee, shall have the ***exclusive right to value any Overbid Increment*** that includes Non-Cash Consideration. Subject to Section 11 below, ***no Qualified Bidder may object to a Qualified Bid on the bases that such Qualified Bid is not the highest or best bid***. Upon completion of the Auction, the Debtor in Its Authorized Discretion, upon consultation with CoBank and the Committee, shall announce to the Qualified Bidders which Bid or Bids represent the highest and best offer(s) for the Assets and is/are in the best interest of the Debtor's estate and its creditors (the "**Winning Bid**").

See Bidding Procedures Order at ¶ 5(c) (Emphasis added).

28. The Debtor, in its Authorized Discretion, as it had the <u>exclusive</u> right to do, valued Greeley FAB's bid including non-cash consideration lower than JBS's all-cash bid. The Bidding Procedures Order specifically prevents Greeley FAB from now second-guessing the Debtor's exclusive business judgment. The Court need go no further to conclusively dispose of this matter. The Auction was conducted precisely as the Debtor and the insider requested and according to the Bidding Procedures Order.

29. The Bidding Procedures Order is binding on all parties who participated in the Auction and Greeley FAB's last minute opposition to the Auction results in nothing more than a collateral attack on an order of the Court. If the Court concludes that the Bidding Procedures is, in fact binding on Greeley FAB, as it must do, the Court has no choice but to strike Greeley FAB's opposition and simply move toward a determination that the Debtor used it reasonable business judgment in selecting JBS's $14,250,000 cash bid. The undisputed facts of the case support upholding such business judgment.

30. Although Greeley FAB has not filed a motion for relief from an order under Fed. R. Bankr. P. 9024, in essence, Greeley FAB is asking the Court to rewrite the Bidding Procedures Order. Yet, no grounds for doing so have been alleged. As a stalking horse bidder made up of insiders of the Debtor, Greeley FAB was directly involved with the development of the Bidding Procedures and the process by which they were eventually approved by the Court. Now, dissatisfied with the outcome, Greeley FAB seeks to retroactively revise the Bid Procedures to better suit its needs.

31. In good faith reliance on the Bidding Procedures approved by the Court, JBS devoted substantial resources to doing the necessary due diligence, qualifying as a bidder and eventually prevailing at the auction. At each step in the process, JBS meticulously adhered to the

Bid Procedures in order to ensure its eligibility to bid. It is grossly unfair to JBS to retroactively alter the rules established by the Court in order to favor another bidder.

32.  Ultimately, the decision of the Debtor to select JBS's bid as the highest and best, in consultation with CoBank and the Creditors Committee, must be evaluated under the "business judgment" test. *See In re Castre, Inc.*, 312 B.R. 426, 428 (Bankr. Colo. 2004), *citing In re Lionel*, 722 F.2d. 1063 (2nd Cir. 1983). The three factors to consider are:

a) Any improper or bad motive;

b) The price is fair and the negotiations or bidding occurred at arm's length; and

c) Adequate procedures, including proper exposure to the market and accurate and reasonable notice to all parties in interest.

33.  There is no allegation by any party that the Debtor has deviated from the foregoing standards in any way. The Debtor and its professionals carefully exercised their best business judgment in accordance with the Bid Procedures. While Greeley FAB is unhappy with the outcome, it has not asserted grounds for substituting its judgment for the Debtor's.

## CONCLUSION

34.  Greeley FAB is bound by the Bid Procedures that were approved by the Court. It is precluded from objecting to JBS's bid on the basis that it is not the highest or best bid. It is without standing to object and be heard with respect to the selection of JBS as the highest and best bid. Nor has Greeley FAB asserted grounds to overturn the Debtor's legitimate exercise of discretion in selecting the highest and best bid. Accordingly, the evidence that it proposes to offer must be excluded and any attempts to oppose the Sale Motion, denied.

WHEREFORE, JBS respectfully requests that the Court enter its Order approving the sale to JBS as the highest and best bidder, and for such other and further relief as is appropriate.

DATED this 15th day of July, 2020.

/s/ Brent Cohen
**LEWIS ROCA ROTHGERBER CHRISTIE LLP**

*Counsel for JBS U.S.A. Food Company and Swift Beef Company*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on July 15, 2020, a true and correct copy of the foregoing JBS's BRIEF IN SUPPORT OF SALE OF DEBTOR'S ASSETS was electronically filed and served via CM/ECF pursuant to L.B.R. 9036-1 and 2082-1(a) and (b) and was served upon the following listed below by depositing same in the United States mail, first-class postage prepaid, addressed to the following:

**Mountain States Rosen LLC**
920 7th Ave
Greeley FAB, CO 80634

**William Cross**
Markus Williams Young & Hunsicker LLC
wcross@markuswilliams.com

**Bradley T Hunsicker**
Markus Williams Young & Hunsicker LLC
bhunsicker@markuswilliams.com

**James T. Markus**
Markus Williams Young & Hunsicker LLC
jmarkus@markuswilliams.com

**Markus Williams Young & Hunsicker LLC**
106 East Lincolnway, Suite 300
Cheyenne, WY 82001

**Otis & Bedingfield, LLC**
1812 56th Avenue
Greeley FAB, CO 80634

**Daniel J. Morse**
Assistant U.S. Trustee
daniel.j.morse@usdoj.gov

**Terry Wynn Connolly**
Patton & Davison
terry@pattondavison.com

**Frederick D Cruz**
Tucker Ellis LLP
950 Main Ave., Suite 1100
Cleveland, OH 44113

**Thomas Richard Fawkes**
Tucker Ellis LLP
thomas.fawkes@tuckerellis.com

**Brian J. Jackiw**
Tucker Ellis, LLP
brian.jackiw@tuckerellis.com

**Patton & Davison, LLC**
1920 Thomes Ave, Suite 600
Cheyenne, WY 82001

**Tucker Ellis, LLP**
233 S. Wacker Drive, Suite 6950
Chicago, IL 60606

**UFCW Local 174 Pension Fund**
c/o Cohen, Weiss and Simon LLP
Attn: Michael S. Adler
900 Third Ave, Suite 2100
New York, NY 10022

111745379.1

**Converse County Bank**
c/o Attorney Dale W. Cotta
dale@performance-law.com

**Brad Dempsey**
Faegre Drinker Biddle & Reath LLP
brad.dempsey@faegredrinker.com

**Michael Seth Adler**
Cohen, Weiss and Simon LLP
madler@cwsny.com

**Bryan T. Glover**
Stoel Rives, LLP
bryan.glover@stoel.com

**Kyle Hosmer**
Faegre Drinker Biddle & Reath LLP
kyle.hosmer@faegredrinker.com

**Brian J. Jackiw**
Tucker Ellis, LLP
brian.jackiw@tuckerellis.com

**Travis Jordan**
Faegre Drinker Biddle & Reath LLP
travis.jordan@faegredrinker.com

**Jodi D. Shea**
Pence and MacMillan LLC
jshea@penceandmac.com

**Michael R. Stewart**
Faegre Drinker Biddle & Reath LLP
2200 Wells Fargo Center
90 S.7th Street
Minneapolis, MN 55402

**Isaac N. Sutphin**
Holland & Hart, LLP
insutphin@hollandhart.com

**Timothy L. Woznick**
Crowley Fleck PLLP
twoznick@crowleyfleck.com

*s/ Christina Marquez*
LEWIS ROCA ROTHGERBER CHRISTIE LLP

111745379.1