FILED

5:01 pm, 7/21/20

Tim J. Ellis
Clerk of Court

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| In re:<br><br>MOUNTAIN STATES ROSEN, LLC<br><br>Debtor | Case No. 20-20111<br>Chapter 11 |

**MEMORANDUM OPINION FOR APPROVAL OF**
**(A) ASSET PURCHASE AGREEMENT AND AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS;**
**(B) AUTHORIZING THE SALE OF ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, RIGHTS, ENCUMBRANCES AND OTHER INTERESTS PURSUANT TO BANKRUPTCY CODE SECTIONS 363(b), 363(f) AND 363(m);**
**(C) ASSUMING AND ASSIGNING CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES PURSUANT TO BANKRUPTCY CODE SECTION 365; AND**
**(D) GRANTING RELATED RELIEF**

This matter is before the court on the above-captioned motion filed by Debtor Mountain States Rosen, LLC., to liquidate Debtor's assets.[1] An evidentiary hearing was held July 17, 2020, with closing arguments by telephone conference on July 20, 2020. At the conclusion of the closing arguments, the court took the matter under advisement. The court reviewed the docket, testimony and documentary evidence and approves the Motion.

**Jurisdiction**

This court has jurisdiction of the matter under 28 U.S.C. §§ 1334 and 157. This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (M) and (O). Venue is proper subject to 28 U.S.C. §§ 1408 and 1409.[2]

**Background**

Debtor determined that reorganization was not viable and proceeded toward liquidating its assets. The auction was conducted on July 9, 2020, in accordance with the approved Bid Procedures. The auction resulted in the determination Swift Beef Company, a Delaware Corporation (Swift), was the highest and best offer for the assets, for the cash purchase price of

---

[1] The court is aware a Chapter 11 debtor is a debtor in possession. However, for simplicity sake, Mountain States Rosen is referred to as "Debtor" in this Memorandum.

[2] All future references to "Code," "Section," and "§" are to the Bankruptcy Code, Title 11 of the United States Code, unless otherwise indicated. All future references to "Bankruptcy Rule" or "Rule" are to the Federal Rules of Bankruptcy Procedure.

$14,250,000.[3] The back-up bidder, Greeley Fab LLC (FAB) objects to Debtor's determination Swift's offer was the highest and best offer.

FAB is a Wyoming limited liability company formed March 4, 2020. Frank Moore is listed as its organizer and registered agent. He is also a co-owner and manager. FAB is an insider of Debtor under Section 101(31), due to the connection with Mr. Moore. Mr. Moore testified he is and has been the chairman of Debtor's board, since 2008. He is vice chairman of the Mountain States Coop, the organization that owns 87 percent of Debtor. Mr. Moore owns six percent. Mr. Moore testified the purpose FAB was formed was to purchase Debtor prior to it filing for bankruptcy. However, Debtor claims due to an unfunded pension liability, it filed for bankruptcy protection.

The Official Unsecured Creditors' Committee and CoBank, ACB, Debtor's largest secured creditor support the sale of Debtor's assets to Swift. The International Brotherhood of Teamsters (Teamsters) is the only other creditor supporting the FAB offer.

**Discussion**

Section 363(b) provides: "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." To approve a sale of substantially all of Debtor's assets outside the ordinary course of business, the Debtor must show: (1) that a sound business reason exists for the sale; (2) there has been adequate and reasonable notice to interested parties, including full disclosure of the sale terms and the Debtor's relationship with the buyer; (3) that the sale price is fair and reasonable; and (4) that the proposed buyer is proceeding in good faith.[4] The court needs to find the evidence establishes a good business reason to grant an application to sell substantially all of Debtor's assets outside the confines of a confirmed plan.[5]

Herein, Debtor proffered testimony supporting all of the elements. Upon cross-examination, none of the parties challenged these elements nor that there was good business reason to sell the assets. Instead, the issue before this court is whether JBS' sale offer is the "highest and best" offer when it does not assume the PPP loan[6] nor does it plan to continue operations of the facility as a lamb processing plant.[7] Per the bidding procedures, Debtor had discretion to determine the highest and best bid:

> Upon completion of the Auction, the Debtor in Its Authorized Discretion, upon consultation with CoBank and the Committee, shall announce to the Qualified

---

[3] Swift Beef Company is owned by JBS S.A., a Delaware corporation.
[4] *In re Med. Software Sols.*, 286 B.R. 431, 439–40 (Bankr. D. Utah 2002).
[5] *Id.*
[6] The PPP Loan is the Paycheck Protection Plan Loan, provided under the Coronavirus Aid, Relief and Economic Security Act (CARES), Public Law 116-136 (March 27, 2020).
[7] *In re Family Christian, LLC*, 533 B.R. 600, 627 (Bankr. W.D. Mich. 2015) ("a debtor must demonstrate that the proposed purchase price is not only the highest offer, but the highest and best offer.").

    Bidders which Bid or Bids represent the highest and best offer(s) for the Assets and is/are in the best interest of the Debtor's estate and its creditors (the "Winning Bid").

"In determining whether to approve a proposed sale under section 363, courts generally apply standards that, although stated various ways, represent essentially a business judgment test."[8] Under the business judgment standard, the court examines the sale's process and procedure and gives deference to Debtor's choice of the winning bid.[9]

  FAB argues the value of the PPP loan assumption should be the full value of the loan at $3.95 million instead of $1.25 million. It also asserts Debtor should have added a value based on its intent to continue lamb processing operations and the impact to the industry if Swift converts the plant to a beef facility.

  Section 5(c) of the bid procedures explains: "The Debtor in Its Authorized Discretion,[10] upon consultation with CoBank and the Committee, shall have the exclusive right to value any Overbid Increment that includes Non-Cash Consideration." Debtor, after consultation with these entities announced at the outset of the auction it was valuing the assumption of the PPP loan at $1.25 million. Debtor counsel explained to the parties it had determined the value using a 40% risk of repayment. The $1.44 million value was then reduced to $1.25 to arrive at a cash equivalent—cash in hand at sale versus potential cash in hand down the line if forgiven. Debtor did not divulge in greater detail, under the concept of attorney-client work product privilege and the risk of admissions being used against them in subsequent litigation, the entities' discussion arriving at the $1.25 million value. FAB as the stalking horse bidder, was intimately involved in negotiating the bid procedures and knew it intended to assume the PPP loan, so it also knew such assumption was subject to valuation under Section 5(c).

---

[8] 3 Collier on Bankruptcy P 363.02 (16th 2020); *see also Allen v. Absher* (*In re Allen*), 607 F. App'x 840, 843 (10th Cir. 2015) ("The 'business judgment' test applies to determine whether a sale under § 363(b) should be approved.").

[9] *In re Castre, Inc.*, 312 B.R. 426, 429 (Bankr. D. Colo. 2004).

[10] Debtor's "Authorized Discretion" is defined in the Bid Procedures as,
 Any action or decision to be made by the Debtor in "Its Authorized Discretion" shall be made as follows: (i) it shall made by $r^2$ as the Court-approved disinterested financial advisor for the Debtor in compliance with the Debtor's fiduciary duties to the estate and its creditors after consultation with the Debtor, the Committee and CoBank; (ii) $r^2$ shall exercise reasonable business judgment in compliance with the Debtor's fiduciary duties to the estate and its creditors; and (iii) in compliance with the Debtor's fiduciary duties, $r^2$ shall consider the interests of Debtor's estate and its creditors to maximize the value of bankruptcy estate and the recoveries to creditors. $r^2$ shall share with the Debtor's management, the Committee and CoBank its analysis regarding the exercise of its business judgment in taking any such action or making any such determinations or decisions. In fulfilling its duties in connection with these Bid Procedures, and subject to the requirements for Qualified Bids herein, $r^2$ may receive and consider bids for any particular asset or grouping of assets that may be presented by any potential bidder. Doc. 174, p. 24 of 29.

A debtor's business judgment enjoys "great judicial deference," but this discretion is not without limit.[11] Deference to a debtor's decision as to a successful bidder of its assets is appropriate, and the court should honor that decision it is proven the debtor abused its discretion.[12] "It is only in the context of a strong and unusual case to the contrary in which a bankruptcy court should approve a sale to a party which the DIP does not deem the highest and/or best bidder in an auction sale."[13] "A debtor's business decision should be approved by the court unless it is shown to be so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice."[14]

Regardless of a debtor's discretion, debtors, in conducting the sale process, have a fiduciary duty to maximize the value of their estates.[15] The fiduciary duty does not require Debtor to mechanically accept a bid with the highest dollar amount.[16] Debtors are permitted, and in fact are encouraged, to evaluate other factors such as contingencies, conditions, timing, or other uncertainties in an offer that may render it less appealing.[17] No parties presented evidence there was concern over either bidders' financial ability to complete the deal or other material contingencies.[18]

It appears from the approved bid procedures the drafting parties attributed no value to the loan assumption. Debtor received an offer from FAB for the aggregate purchase price of $10,000,000, plus assumption of certain liabilities, including the PPP Loan from Converse County Bank of Douglas, Wyoming, in the principal amount of $3,595,000—the stalking horse bid. To be a qualified bid, a party had to submit an offer in $100,000 increments beginning at no less than $10.1 million. Had FAB believed there was measurable value to the assumption or going concern value, they could have insisted and demanded a qualified bid be more than $13,595,000 at a minimum.

---

[11] *In re Broadmoor Place Investments, L.P.*, 994 F.2d 744, 746 (10th Cir. 1993); *In re Diplomat Const., Inc.*, 481 B.R. 215, 220–21 (Bankr. N.D. Ga. 2012) ("Even though the [debtor's] discretion is not without limit, the Court should not step in and assume a role and responsibility properly placed in the hands of the Trustee under these facts."; *In re Bakalis*, 220 B.R. 525, 532 (Bankr. E.D.N.Y. 1998).
[12] *In re After Six, Inc.*, 154 B.R. 876, 881 (Bankr. E.D. Pa. 1993).
[13] *In re After Six, Inc.*, 154 B.R. at 882.
[14] *In re 160 Royal Palm, LLC*, 600 B.R. 119, 126 (S.D. Fla.), *aff'd,* 785 F. App'x 829 (11th Cir. 2019) (quoting *In re SW Boston Hotel Venture, LLC*, No. 10-14535-JNF, 2010 WL 3396863, at *3 (Bankr. D. Mass. Aug. 27, 2010)).
[15] *In re Family Christian, LLC*, 533 B.R. 600, 621 (Bankr. W.D. Mich. 2015).
[16] *In re Family Christian, LLC*, 533 B.R. at 622.
[17] *Id.* S*ee also In re 160 Royal Palm, LLC,* 600 B.R. at 130 ("The Debtor's duty is to maximize value to the creditors, and that maximization includes considerations such as finality, stability, and expeditious resolution of the bankruptcy proceeding.").
[18] *See In re Bakalis,* 220 B.R. 525, 533 (Bankr. E.D.N.Y. 1998) (accepting a lower monetary bid when lower bid could close sooner with reserved cash on hand and obtain quick regulatory approval.). The court recognizes the forgiveness of the loan is still a contingency, but the closing of the sale is not dependent on its forgiveness.

The first time the parties were made aware of any value placed on the loan assumption was at the auction by an announcement prior to bidding. At that time, Swift registered its objection, and it was an ongoing objection throughout the auction. The auction continued without objection from FAB until the fourth round. Now, FAB asks the court to have a separate evidentiary hearing to determine the appropriate value to attribute to the loan forgiveness. The court finds this unnecessary as FAB's course of conduct until the last round of bidding indicated the value Debtor assigned to the loan assumption was reasonable. FAB explains it was following the bid procedures during the auction and instead chose to object to the provided value before the court. However, FAB was in a unique position as it had the ability to assert values related to the PPP and going-concern value as part of its initial offer. It chose not to do so and did not attribute any value to the assumption in its stalking horse bid. It did not challenge the value Debtor assigned to the assumption, despite Swift's ongoing objection. Only at the end of the auction and having been outbid three times did it assert the value of the assumption was 100%.

Mr. Moore testified the loan "is very much in question" and there really is no means to accurately measure the value as everything is "up in the air." The court agrees, and as such, does not believe there is any better information available to any party to make a more accurate determination. More troubling to the court is there was no evidence presented that FAB's loan assumption would relieve Debtor from the obligation between Debtor and the SBA. FAB did not identify any efforts made to receive approval to assume the loan and release Debtor. The assumption of the PPP loan is essentially worthless if the court cannot point to any evidence the assumption of the loan would release the estate from liability. While the court does not question FAB's intent to assume the loan and pursue the necessary release, the court is entirely without evidence as to the SBA requirements to assume a loan and if it is even a possibility in these circumstances, regardless of FAB's intent.

The court is also concerned the assumption of the loan could make loan forgiveness less possible as it is uncertain whether the formula for forgiveness would be based on Debtor or the assuming party. The potential inability is a material contingency that could result in less recovery to the estate. While the risk of repayment exists with the Swift offer, there is more money offered to absorb such risk. The court does not find Debtor abused its discretion in arriving at a $1.25 million value to the loan assumption and will not substitute its own or another party's judgment.

Second, FAB argues maintaining the facility as an on-going operation should be a factor the court must consider in determining the best bid. Neither as part of the bid procedures nor the auction process did FAB assert Debtor should give value to its intent to continue operating the facility but now claims it was a mistake for Debtor not to do so. Courts found it appropriate to give value to factors such as continual employment. A court may "appropriately award a bid to a lower bidder,

when that lower bidder had other factors, including even an element as lacking in direct economic impact as 'societal needs,' in its favor."[19] The court agrees the overriding Chapter 11 objective is to preserve a business as a going concern and prevent a debtor from going into liquidation with a loss of jobs.[20] However, this case was a liquidation case from the outset.[21] Debtor continued to operate the facility as a going-concern with the benefit of the PPP loan to help achieve a higher liquidation value.[22]

The FAB Purchase Agreement specifically addressed the non-assumption of the current collective bargaining agreement or retention of current employees,

> "In particular, but without limitation, Buyer [FAB] shall not assume any liabilities of Seller under, and Buyer shall not be deemed a successor company to Seller in connection with, any Employee Plan, collective bargaining agreement or other employment related arrangement to which the present or former employees . . . are or were entitled . . . Buyer shall have no obligation to employ any of Seller's employees. . . ."[23]

The FAB Purchase Agreement established FAB has no future liability to Debtor's current employees. Additionally, the Teamster's collective bargaining agreement is set to expire the end of July. Aside from the alleged WARN penalties from Debtor not having provided timely notice, employees are not guaranteed jobs either way. Moreover, when FAB negotiated the stalking horse bid and procedures, it gave no value to this factor, nor did it do so during the auction process, so the court is not now able to override Debtor's discretion on this basis.

The court also declines to attribute value for the impact to the industry on the same grounds. Mr. Moore testified as to the lack of capacity and the impact on the industry if this facility is changed to beef operations. As the operating manager of FAB and Debtor's chairman, Mr. Moore was privy to this knowledge at the time FAB determined its stalking horse bid. Had this been of such measurable value to be included in the bid, FAB should have insisted so at that stage. To do so now is insufficient to overcome the deference given to Debtor's decisions. While FAB's offer proposes to

---

[19] *In re After Six, Inc.*, 154 B.R. 876, 882 (Bankr. E.D. Pa. 1993) (the court declined to accept the lower bid despite a commitment to maintain the employees because the court did not have a basis to exercise its discretion to the contrary of the debtor in possession. The court could not conclude the "prospects of Genesco's employment of the Debtor's former employees is so clear that it necessarily outweighs the rather clear economic factors to the contrary.

[20] *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984).

[21] *In re After Six, Inc.*, 154 B.R. at 882 ("This case is clearly a liquidating Chapter 11 case and that factor justifies some greater deference to the Committee's viewpoints than were it a reorganization case.").

[22] *In re Glob. Serv. Grp., LLC*, 316 B.R. 451, 460 (Bankr. S.D.N.Y. 2004) ([C]hapter 11 is based on the accepted notion that a business is worth more to everyone alive than dead.").

[23] MSR/Greeley FAB Purchase Agreement, Doc. 131-1, p. 5-6 of 48.

save jobs[24] and assume a potentially forgivable loan, the court does not find these factors create a value to the estate that would allow it to override Debtor's discretion.

The court is sympathetic to contributing to both the unemployment situation during such troubling times and potentially further suppressing the lamb market. However, the evidence creates questions as to the benefit of the going-concern operation. Mr. Moore testified FAB intends to operate the processing facility. Ideally, FAB wants to continue the employment of workers, retain services of vendors and the infrastructure of the processing facility for the region for the greater good. However, beyond the testimony he wanted to continue the business of the processing facility, there was no evidence that the facility could operate at full capacity or any type of prepared business plan. Mr. Frank stated historically there are not enough lambs to run at capacity year-round, as the largest percentage are born within four-five months, going to market within six months with Easter and Christmas being the strongest time for market demand. There was made mention of the difficulty of getting stock to market, during this Covid-19 time, but no indication FAB being awarded the winning bid would resolve this issue. Most importantly, this is not the continued operation of Debtor, but the operation of the facility under new owners. Thomas M. Kim, Debtor's financial advisor, from $r^2$ advisors llc, testified it was an impossible task to analyze the going concern value of FAB, as it is not the Debtor. The court finds this is not a factor carrying weight to disregard the Debtor's discretion for approval of the Swift bid.

Considering the above FAB has not shown Debtor's determination Swift is the highest and best offer, to be so manifestly unreasonable that it could not be based upon sound business judgment. There is no evidence of bad faith, nor that the decision was made on a whim or with caprice. The court will not overrule Debtor's discretion in determining Swift was the highest and best offer.

The separate sale order based on this ruling will be entered.

BY THE COURT

_____ 7/21/2020
Honorable Cathleen D. Parker
United States Bankruptcy Court
District of Wyoming

Service to:
    Brad Hunsicker
    Jodi Shea/Bryan Glover/Steven Lovett

---

[24] Swift counters that while it may not employ current employees in their current capacity, jobs are available through Swift and will be made available to retrofit and operate the facility.

Sara Geenen/Jeffrey Boldt
Ronnie Lopez
Brent Cohen/Christopher Giaimo
Terry Connolly/Thomas R. Fawkes/Brian Jackiw
Isaac Sutphin
Brad Dempsey/Michael Stewart
Tim Woznick